Filed 5/18/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LONNIE JAMES KERLEY,<br><br>     Defendant and Appellant.</td><td>A138219<br><br>(Solano County<br>Super. Ct. No. FCR286584)</td></tr>
</table>

After a lengthy trial, a jury found defendant Lonnie James Kerley (Kerley) guilty of second degree murder in connection with the death of his former girlfriend, Danna Dever (Dever). The trial court sentenced Kerley to 15 years to life in state prison. On appeal, Kerley asserts that numerous evidentiary, instructional, and constitutional errors require reversal of his conviction. For the reasons that follow, we will affirm.

**FACTUAL BACKGROUND[1]**

Dever began dating Kerley in the early 1980's, and their daughter, Mandee Kerley, was born in 1986. Kerley, Dever, and Mandee lived together on Oakbrook Circle in Cordelia, California (the Oakbrook residence). Kerley worked for the Napa School District, driving a garbage truck and later working in the plumbing department.

---

[1] Rather than attempt a comprehensive summary of the extensive evidence presented at trial, we provide here only an overview for context and as relevant to the issues on appeal. Additional details will be provided as necessary for discussion of each issue below.

*1. Dever and Kerley's Relationship*

At trial, the prosecution presented extensive testimony from Dever's family, neighbors, and friends that her relationship with Kerley was abusive and physically violent.

For example, Denae D., Dever's sister, testified that, when Dever was eight or nine months pregnant with Mandee, she witnessed Kerley, who was wearing steel-toed boots, punching and kicking Dever in the stomach as Dever tried to leave their apartment. Denae testified that eventually the police were called and that Kerley "took off." Denae described Dever's relationship with Kerley as verbally and physically abusive, and stated that she observed Dever with "many black eyes" over the course of their relationship. She also testified that Kerley "broke or bruised" Dever's ribs, and at one time, cut Dever's hair. According to Denae, Kerley would not allow Dever to spend time with Denae and her family.

Shortly after Mandee was born, Susan D., Dever's stepmother, received a phone call from Kerley's mother, who was "frantic" and worried that Dever would hurt herself or Mandee. Susan went to Dever's house. When she arrived, Dever began to open the door, but Kerley appeared, pushed Susan aside, knocked Dever to the ground and began kicking her. Meanwhile, Kerley's mother picked up Mandee and took her to the car. Kerley then left with his mother and Mandee. Dever suffered bruises to her side, hip, leg, and arm. Susan also testified that on several occasions she saw Dever with black eyes and with her face or arms "black and blue."

Deborah M., another of Dever's sisters, testified that sometime before 1990, Dever called and asked Deborah to come over because she (Dever) was fighting with Kerley. Deborah arrived at Dever's apartment and witnessed Kerley kicking Dever, who was on the floor "crying and screaming." Deborah also saw Dever with "her face all bruised up," an eye that had been "bludgeoned," and bruises on her back. Over the years, Dever left Kerley approximately five times and stayed with Deborah at her home.

2

*2. December 1989 Incident*

On December 24, 1989, at around 1:00 a.m., Fairfield police officer Caree Harper responded to a call reporting a disturbance at the Oakbrook residence. When Officer Harper arrived, she heard Dever screaming "Trudy, Trudy" very loudly. As Dever continued screaming, another officer who had arrived knocked on the door. Kerley opened the door, said, " 'Everything is fine,' " and quickly slammed it shut again. Dever continued to scream, and Officer Harper and the other officer broke a window in order to pull Dever out of the house. Dever was "hysterical, frantic, scared [and] panicked," and told the officers, " 'Hurry, I know he's going to kill me.' " Dever was taken to the police station, where she gave a statement. Dever told Officer Harper that Kerley had beaten her because she failed to find a woman with whom she could have sex while Kerley watched. Dever said that Trudy had engaged in sex with them before, but she refused to do so again because Kerley had held a gun to her head and was too violent. Officer Harper photographed Dever's injuries, which included a one-inch cut above her left eye and a bruise on her thigh.

*3. January 1996 Incident and Domestic Violence Charges*

On January 7, 1996, Fairfield police officer Hank McCoy responded to a domestic violence call at the Oakbrook residence. Dever answered the door with two black eyes, and was shaking and crying uncontrollably. Dever jumped onto Officer McCoy and yelled, " 'Help me, help me, save me, save me, he did this.' " Kerley was standing in the doorway, and Mandee was in the back of the room. Officer McCoy carried Dever to his patrol car and put her in the back seat. Dever told Officer Julie Cross that Kerley had "stomped her right hand and foot at the same time, and then he kicked her in her eye with his right foot." Dever said that, when she went to call 911, Kerley told her he would kill her if any police officers came to the house. The police obtained an emergency protective order preventing Kerley from contacting Dever or Mandee. Kerley was arrested and taken to the police station, where he gave a statement that Dever was injured when she ran into a wooden fence and then "proceeded to scratch and hit herself."

3

A few days later, Dever appeared at the Fairfield Police Department and filled out a form requesting that the domestic violence charges against Kerley be dropped. Nevertheless, domestic violence charges were filed against Kerley on January 23, 1996. On February 6, 1996, Dever again visited the Fairfield Police Department and submitted a form requesting that the charges be dropped. A five-page letter apparently signed by Dever was also received by the Fairfield Police Department, asking that the charges be dropped and stating that Dever injured herself. Kerley had a court appearance on the domestic violence charges scheduled for June 19, 1996.

### 4. Dever's Disappearance

Dever disappeared on approximately June 14, 1996. Kerley did not report her missing until August 5, 1996, when he told the Fairfield Police Department that at around 4:15 a.m. on the morning of June 14, 1996, Dever made a comment to the effect that she "couldn't take it anymore" and left the residence with a friend that he did not know. Kerley stated that Dever left on foot without taking anything with her and that he believed she was using methamphetamine.

On August 27, 1996, Fairfield Police Officer Matt Rubin met with Kerley at the Oakbrook residence to follow up on his missing person report. Kerley told Officer Rubin that Dever had left at approximately 8:00 a.m. on June 14, 1996. Dever had gotten dressed, taken her purse and approximately $3,000 that had been intended for household expenses and the mortgage payment, told him that she "loved him but had to leave" and walked out the door. Kerley said Dever did not take her car and he did not know where she had gone. Kerley stated that he was in bed, crying and upset, when Dever left.

At trial, Kerley's mother, Eleanor K., testified that Kerley had called her early in the morning on June 14, 1996 and asked her to come to the house, saying that " 'Danna's going to leave' " and asking that she come talk to Dever. Eleanor and Kerley's father Lonnie went to the Oakbrook residence, and Eleanor talked with Dever. Dever said that she "wanted to leave," that "she was picking up weight, and he wanted her to get her weight down," and that she "had places to go and things to do." Eleanor K. testified Dever also said she was having an affair with her brother-in-law.

4

Kerley and Dever were arguing about some money intended for a school function that Dever had spent. Eleanor testified that Dever hugged Mandee, said that she was leaving and that she loved her, and said, " 'I'll see you later.' " Dever left carrying only her purse, and Eleanor did not see where she went after she went out the front door. Kerley's father, Lonnie, took Mandee to school that morning before 8:00 a.m., so he was not at the home when Dever left.

### 5. *Discovery of Jane Doe No. 7*

On July 8, 1996, two local ranch hands were looking for a coyote near Highway 113 and Flannery Road in a "very rural" area outside of Rio Vista in Solano County. One of the ranch hands saw a nude female body in a dry creek bed partially covered by a green blanket from the torso up. The body was five or six feet from Flannery Road in a ditch seven to nine feet deep, which together with the brush and trees in the area made it difficult to see. The ranch hands left the body undisturbed and alerted the authorities.

The body was very decomposed, skeletonized, and dry, with no organs visible inside. No clothing, jewelry, or identifying information was found on the body, which was designated "Jane Doe No. 7."

### 6. *Autopsy of Jane Doe No. 7*

On July 9, 1996, Dr. Brian Peterson, a contract forensic pathologist for Solano County, performed an autopsy on Jane Doe No. 7. Dr. Peterson concluded that the cause of death could not be determined. He also testified that he removed the chest plate to examine the chest cavity, using pruning shears to cut all but two of the ribs. Dr. Peterson opined that the cuts made to remove the chest plate were not consistent with injuries from stomping, because stomping would not produce symmetrical or "neat" fractures. The body's right hand was removed and saved for identification purposes.

Technicians were later able to rehydrate the skin on the right hand and obtain a usable fingerprint from the right thumb. A fingerprint examiner searched for the print in various databases, but no matches resulted.

On July 16, 1996, Charles Cecil, a forensic anthropologist and retired medical death investigator for San Francisco County, examined the remains of Jane Doe No. 7.

5

He testified that the chest plate had been removed during the autopsy and opined that there was no evidence in the chest cavity of trauma at the time of death.

### 7. *Anonymous Letter Received*

On July 16, 1996, the Solano County District Attorney's Office's received an anonymous typewritten letter addressed to the "District Attorney of Solano County, victim/witness" unit. The letter stated that the author had met a "Danny" at a bar in May, that Danny was bragging about killing a woman over a drug deal gone bad and that he " 'threw her body in some bushes off Highway 13 near Rio Vista.' " The letter also mentioned that the body had been wrapped in a blanket, and referenced a July 9, 1996 newspaper article reporting that a body (Jane Doe No. 7) had been discovered on Flannery Road. The letter described "Danny" as a "big guy with a beard" who frequents a Buckhorn Bar and Carolyn's Bar in Dixon.

At trial, a handwriting expert testified that she compared the handwriting on the envelope containing the letter with numerous samples of Kerley's handwriting, and concluded that it could not have been written by him. The expert also compared samples of Eleanor K.'s handwriting with the envelope and concluded that it was not addressed by her either. However, the person who addressed the envelope had attempted to disguise his or her handwriting.

### 8. *Dr. Murad Examines Jane Doe No. 7*

In July of 1997, investigators delivered Jane Doe No. 7's skull to Dr. Turhon Murad, a forensic anthropologist and professor of anthropology at California State University in Chico. Dr. Murad examined the skull and wrote a report to assist investigators in identifying the remains. In May of 1998, the rest of Jane Doe No. 7's remains were brought to Dr. Murad in Chico for analysis.

Contrary to Dr. Peterson's testimony that he had removed the chest plate during the original autopsy, Dr. Murad testified that the chest plate had not been removed when he received the remains. Dr. Murad testified that he identified two fractures on the left first rib and the ninth right rib which had fully healed at the time of death, and one

fracture on the right first rib that was in the process of healing at the time of death, meaning it had most likely been fractured six weeks or less before death.

Dr. Murad also identified fractures on both the left and right side of ribs two through nine that occurred "perimortem," meaning "around the time of death." Dr. Murad also testified that the hyoid bone in the throat was fused on the right side but not the left side, and had been "displaced" and was "laying over on its side." Dr. Murad opined that the damage to the ribs was consistent with being beaten or "stomped" on the chest, and that the manner of death was a homicide.

Dr. Murad had the body exhumed and reexamined it in January of 2012. His subsequent examination did not change his opinion that the manner of death was a homicide, possibly as a result of a beating.

*9. Excavation of the Yard at the Oakbrook Residence*

In April of 2006, Fairfield Police Department Detective Steven Trojanowski began looking into Dever's disappearance. Trojanowski spoke with Kimberly R., a neighbor of Kerley and Dever's on Oakbrook Circle, who told him that there was a "fly infestation" in the neighborhood and that "Lonnie Kerley was digging all around [his] property at different hours of the day and night" around the time of Dever's disappearance. In May, after obtaining consent from the new owner of the Oakbrook residence, investigators from the Fairfield Police Department and the FBI dug up a depressed area in the backyard. The team found a black nylon suitcase containing a "necklace with a cross on it," some clothing that included "lady's nylon sweatpants," a collar, a hair brush, and the remains of a dog. Because no human remains were located, all the items were reburied.

At trial, Laura K., who lived with Kerley at the Oakbrook residence before they married in 1999, testified that Kerley had a dog named Poison. When Poison died in 1998, Kerley buried the dog in a suitcase in the backyard. Laura K. testified that she went outside to see what Kerley was doing, and he asked her to go back into the house. When she went back outside a second time, Kerley "yelled at [her] to go back inside."

### 10. Investigation Reopens; Dever Identified

In February and March of 2007, Kerley received several telephone calls from the police regarding Dever's disappearance. Shortly afterwards, he took a tanning bed out of his house, "cut it up," loaded the pieces into the car, and drove to Napa to dispose of it.

In April of 2007, Fairfield police investigator Rebecca Belk was assigned Danna Dever's case. Belk asked a fingerprint examiner to perform a fingerprint comparison between Dever and Jane Doe No. 7. The fingerprint examiner concluded that Jane Doe No. 7 was Dever, and the investigation was reclassified as a potential homicide.

### 11. Kerley's Interview and Arrest

On May 15, 2007, a Fairfield Police detective went to Kerley's new residence in Fairfield to notify Mandee Kerley (as next of kin) that Dever's remains had been identified. Kerley, Laura, and Mandee rode together in their own car to the police station. On the way, Kerley repeatedly told Laura, " 'I may be arrested today but remember family sticks with family.' "

At the police station, detectives told Kerley that Dever's remains had been identified, and that she was deceased. Kerley was "nonreactive" to the news. After asking whether Mandee had been informed, Kerley stated "I feel bad 'cause, you know, somebody you lived with for a while." Toward the end of the interview, when told by detectives that they believed Dever had been murdered, Kerley responded, "Okay. Hm, okay, I guess that's about it for now, I guess."

In July 2010, a pubic hair was recovered from the cargo area of a 1972 Chevy Nova hatchback that Kerley had owned prior to 1999. The hair shared the mitochondrial DNA profile of Dever or her maternal relatives, expected to occur in no more than 0.17 percent of the Caucasian population. Kerley and the car's new owner were excluded as sources of the hair. On October 28, 2010, Kerley was placed under arrest. Kerley was indicted by the grand jury for Dever's murder on August 2, 2011.

### 12. Further Forensic Analysis of Dever's Remains

In 2012, Dr. Terri Haddix, a forensic pathologist and medical doctor, examined Dever's remains on behalf of the defense. Dr. Haddix also reviewed medical reports

8

associated with treatment of Dever in the early 1990's, police reports on the examination of the remains in the field, the coroner's records associated with the examination of the remains, the autopsy report, the anthropology reports authored by Charles Cecil and Turhon Murad, photographs of the body at the scene and at the time of the original autopsy, photographs taken during Dr. Murad's examination, and the grand jury transcript.

Haddix opined that Dever's cause of death and manner of death were both undetermined.[2]  Haddix also disagreed with Dr. Murad and opined that Dever's chest plate was removed as part of the initial autopsy, as reflected in the autopsy report. Haddix testified that Dever's hyoid bone was not damaged, but merely unfused on one side.  Haddix explained that the hyoid bone has three parts, and as an individual grows older, the three parts fuse together.  Haddix testified that Dever's hyoid bone was simply fused on one side but not the other, which was "very, very normal" and in no way indicative of a defect or a fracture.

Dr. Allison Galloway, a forensic anthropologist, also examined Dever's remains in 2012, along with Dr. Haddix, on behalf of the defense.  In forming her opinion, she reviewed the grand jury testimony, the autopsy report, and the reports of Charles Cecil and Dr. Murad.  Dr. Galloway agreed with Dr. Haddix that there was no damage or fracture to Dever's hyoid bone; it was simply fused on one side and not the other, which she characterized as "absolutely normal."  Dr. Galloway also opined that certain damage to Dever's ribs postdated her death and was consistent with removal of the chest plate as part of the autopsy, and that this was not even a "close call."

**PROCEDURAL BACKGROUND**

On August 2, 2011, a Solano County grand jury indicted Kerley on one count of murder (Pen. Code, § 187, subd. (a).)  Trial began on October 24, 2012 and concluded on

---

[2]  In California, "manner of death" appears on the death certificate and can be one of only five options:  natural, accident, suicide, homicide, or undetermined.  "Cause of death" is not so limited and describes the specific cause of death, such as a heart attack, infection, gunshot wound, or drowning.

9

December 19, 2012.  On January 2, 2013, the jury found Kerley guilty of second degree murder, and the trial court later sentenced him to 15 years to life in prison.  This appeal followed.

## DISCUSSION

On appeal, Kerley contends that: (1) there was insufficient evidence for the jury to conclude that Dever's death was a homicide; (2) the trial court erred in admitting evidence of Kerley's prior acts of domestic violence under Evidence Code section 1109[3]; (3) the jury instructions regarding the evidence of uncharged domestic violence impermissibly lowered the prosecution's burden of proof; (4) the admission of certain hearsay statements of the deceased violated Kerley's confrontation clause rights under *Crawford v. Washington*[4]; (5) the trial court violated Kerley's due process rights in denying a motion for a mistrial based on the admission of those statements; (6) the trial court erred in admitting certain hearsay statements of the deceased; (7) defense counsel was ineffective in failing to request a limiting instruction with respect to those statements; (8) the evidence was insufficient to support the jury instructions regarding suppression of evidence; (9) the trial court erred in admitting certain diary entries of Kerley's daughter Mandee Kerley; (10) the trial court erred in admitting evidence that Kerley destroyed a tanning bed and buried the remains of his dog in his backyard; (11) the trial court erred in excluding Kerley's proffered evidence of third party culpability; and (12) the cumulative effect of the alleged errors requires reversal.  We will address each argument in turn.

### I. Sufficient Evidence Supports the Jury's Guilty Verdict

Kerley's first argument is that there was insufficient evidence for the jury to conclude that Dever's death was a homicide.  In particular, Kerley argues that Dr. Murad's testimony that Dever's death was a homicide was "inherently improbable" because it was contradicted by all the other expert testimony regarding the cause and

---

[3]  All further statutory references are to the Evidence Code, unless otherwise indicated.

[4]  *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

10

manner of Dever's death. The People respond that, even without Dr. Murad's opinion, there was ample circumstantial evidence that Dever's death was a homicide, and that Dr. Murad's opinion was not "inherently improbable," but merely one with which other experts disagreed. In response to the People's argument that circumstantial evidence showed that Dever was murdered even apart from Dr. Murad's opinion, Kerley argues that there was no "evidence showing that Dever died violently, that the cause of death was from an assaultive act and thus a homicide," and that "[w]hether Dever's death was a homicide as opposed to an accidental death was a critical issue in dispute."

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).)

Kerley's argument fails because it is based on the faulty premise that an expert opinion that Dever's death was a homicide is necessary in order to sustain Kerley's murder conviction. *People v. Towler* (1982) 31 Cal.3d 105 (*Towler*) is instructive. In *Towler*, as here, the victim's body was found in a remote area, two months after he disappeared. (*Id*. at p. 112.) Because of the deterioration of the body, the medical

11

evidence at trial did not establish a cause of death. (*Id.* at p. 113.) As here, the defendant argued on appeal that, "in view of the inconclusiveness of the medical testimony and the absence of any proof as to the precise time, manner or cause of death, the trial court could not properly find him guilty of murder under the applicable reasonable doubt standard." (*Id.* at p. 117.) The Supreme Court rejected this argument and concluded that the verdict was supported by evidence that the defendant had the "motive, intent, and opportunity" to kill the victim, and, even though "other possible causes of death were not conclusively disproved, . . . the [fact finder] could have rejected as unreasonable the suggested inference that [the victim] had committed suicide or that his death was accidental." (*Id.* at p. 120.)

So too here. Even without the testimony of the medical experts, there was ample circumstantial evidence from which the jury could conclude that Dever was murdered and that Kerley was responsible. Dever's body was discovered without clothing or jewelry, partially wrapped in a blanket by the side of the road in a remote location. (See *Towler*, *supra*, 31 Cal.3d at p. 120; *People v. Huynh* (2012) 212 Cal.App.4th 285, 301 [noting that a body found in an alley wrapped in a blanket was not consistent with accidental death]; *People v. Kraft* (2000) 23 Cal.4th 978, 1057 [similar].) As Kerley does not dispute, there was ample circumstantial evidence that he had the "motive, intent, and opportunity" to kill Dever, including his long history of domestic violence and threats toward her, plus the pendency of domestic violence charges against him, with a hearing scheduled for mere days after her disappearance. Reviewing the record as a whole in the light most favorable to the prosecution, there was sufficient evidence to support the jury's guilty verdict even without Dr. Murad's opinion that Dever's death was a homicide.

Moreover, Dr. Murad's testimony, if credited by the jury, provided substantial evidence to support the conclusion that Dever was beaten to death. The testimony of a single witness, if believed by the factfinder, is sufficient to prove any fact. (§ 411; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514 ["It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions,' " quoting *People v. Poe* (1999) 74 Cal.App.4th 826, 831].) "Conflicts and

12

even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Huston* (1943) 21 Cal.2d 690, 693, overruled on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352.) We conclude the evidence as a whole was sufficient to support the jury's verdict.

## II. The Trial Court Did Not Err in Admitting Prior Incidents of Domestic Violence Under Section 1109

### A. Factual Background

As part of their motions in limine, the People sought to introduce evidence pursuant to sections 1101, subdivision (b) and 1109 that on numerous occasions Kerley had committed acts of domestic violence against Dever. Kerley objected to admission of this evidence.

The trial court heard lengthy argument on these issues and ruled that most of the instances of domestic violence proffered by the People were admissible pursuant to both sections 1101, subdivision (b) and 1109, while others were not.

Kerley challenges the trial court's rulings admitting prior instances of domestic violence pursuant to section 1109 on the grounds (1) that there was insufficient evidence that Dever's death was caused by an assaultive act and (2) that the undue prejudice from this evidence substantially outweighed its probative value within the meaning of section 352. Kerley argues the erroneous admission of this evidence was harmful, depriving him of a fair trial.[5] The People respond that the trial court properly admitted this evidence under section 1109.

### B. Applicable Law

Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offense—is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).) Evidence that the defendant committed uncharged

---

[5] Kerley does not challenge the trial court's ruling that the prior instances of domestic violence were admissible under section 1101, subdivision (b).

13

crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident. (§ 1101, subd. (b).)

The Legislature, moreover, has carved out specific exceptions to this general rule in cases involving domestic violence, elder abuse, and child abuse (§ 1109) and cases involving sexual offenses (§ 1108). Section 1109 provides, in relevant part, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a).) "[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.) As a result, section 1109 "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]" (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024 (*Hoover*).) Section 1109 "reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532 (*Johnson*).)

As noted, section 1109 expressly incorporates the limitations of section 352. Therefore, before admitting evidence under section 1109, the trial court must exercise its discretion to determine whether the probative value of the evidence is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

"Undue prejudice," as used in section 352, however, does not mean evidence that is harmful to the defendant's case. " ' " '[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The

14

stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*People v. Fruits* (2016) 247 Cal.App.4th 188, 205 (*Fruits*), quoting *People v. Holford* (2012) 203 Cal.App.4th 155, 167 (*Holford*), italics omitted.)

"  ' 'Trial courts enjoy " 'broad discretion' " in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  [Citations.]  A trial court's exercise of discretion "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Fruits, supra*, 247 Cal.App.4th at p. 202, quoting *Holford, supra*, 203 Cal.App.4th at pp. 167–168.)

### C.      *Kerley Was Accused of a Domestic Violence Offense*

We first address Kerley's argument that his prior acts of domestic violence were improperly admitted into evidence because the People failed to prove Dever was killed by an assaultive act.  Section 1109 contains no such requirement.

Section 1109 applies to any "criminal action in which the defendant is accused of an offense involving domestic violence, . . ." as defined in Penal Code section 13700. (§ 1109, subds. (a), (d)(3).)  Thus, the application of section 1109 to the present case turns on whether Kerley was "accused" of domestic violence.  Kerley was accused of murdering Dever.  To prove that Kerley murdered Dever, the People were required to prove that he committed an act that caused her death with malice aforethought. (CALCRIM No. 520.)  Causing someone's death with malice aforethought unquestionably meets the Penal Code section 13700 definition of "abuse" as "intentionally or recklessly causing . . . bodily injury."  (E.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1235.)  There is no question that Kerley and Dever were cohabitating and had a child together.  Therefore, Kerley was "accused of an offense involving domestic violence" and section 1109 was properly applied to the proffered domestic violence evidence.

15

Kerley's argument that the People failed to prove that Dever died as a result of an assaultive act misses the point.[6] Section 1109 is triggered by the nature of the accusation, not by the sufficiency of the evidence presented to prove that accusation. Moreover, as discussed in section I above, we have found that the jury's conclusion that Kerley murdered Dever was supported by substantial evidence. There was no evidentiary gap.

### D.    *Evidence Code Section 352*

As noted, the People in their motions in limine sought to admit numerous prior instances of domestic violence Kerley perpetrated against Dever, against his prior girlfriend, Nancy F., and against the woman he married after Dever disappeared, Laura K. They sought admission under section 1101, subdivision (b) to prove Kerley's intent, motive, and identity, and to prove Kerley had a common scheme or plan to assault women with whom he had a romantic relationship. Kerley filed a motion in limine to exclude this evidence pursuant to section 1109 on the grounds that it was irrelevant to the charged crime and unduly prejudicial.

The trial court held a section 402 hearing on the admissibility of these prior instances of domestic violence. After extensive argument, the trial court ruled that most of the alleged instances were admissible under sections 1101, subdivision (b) and 1109. The court, however, granted Kerley's motion to exclude three instances: (1) Kerley's 1981 conviction for assaulting his prior girlfriend, Nancy F.; (2) Linda H.'s proffered testimony that she found Dever tied up in the bed in her home; and (3) Laura K.'s proposed testimony that Kerley locked her in a closet. The trial court, therefore, expressly considered Kerley's arguments and exercised its discretion in deciding which prior instances were admissible and which were not under section 352.

First, we note the trial court admitted the domestic violence evidence under section 1101, subdivision (b), to prove Kerley's state of mind, intent, motive, identity, and a common scheme or plan. Kerley does not address this ruling in his challenge to the

---

[6] Kerley's argument that the jury was permitted improperly to use the evidence of prior domestic violence to prove that he murdered Dever is addressed in section III below.

16

admission of the prior domestic violence evidence. Kerley's consistent pattern of assaulting Dever was certainly relevant to his state of mind, intent, and motive in connection with the allegation that he murdered Dever. (*Fruits, supra,* 247 Cal.App.4th at pp. 203–204; *Hoover*, *supra,* 77 Cal.App.4th 1020, 1026.) The trial court's ruling allowing proof of the prior instances of domestic violence under section 1101, subdivision (b) stands as a valid basis for admission of this evidence independent of its ruling under section 1109. Admission of this evidence under section 1101, subdivision (b), however, is still subject to section 352 analysis. Although Kerley does not challenge the trial court's ruling admitting prior instances of domestic violence to the extent it was based on section 1101, subdivision (b), we will consider his section 352 arguments as they apply to this basis for admission as well.

On appeal, Kerley lists 10 instances of domestic violence and argues that, even if relevant to show Kerley's propensity to commit domestic violence under section 1109, their admission into evidence contravened section 352 because the probative value of this evidence was substantially outweighed by the likelihood that jurors would be confused, misled, or distracted from their "main inquiry" of determining whether Dever was murdered and whether Kerley was responsible. These 10 instances are:

1. Tracy A. saw Kerley slap Dever, pull her out of a car by the arm and throw her onto the ground.

2. Denae D. saw Kerley punch and kick a pregnant Dever in the stomach with steel-toed boots as she lay on the ground.

3. Susan D. observed Kerley kick Dever as she lay on the floor between the door and the wall of their home.

4. Dever asked Christy H. to help her hide from Kerley because he had beaten her up again.

5. Darla C. saw Kerley restrain Dever by holding her feet as she was on the ground trying to get out of their home. Dever was bruised.

6. Deborah M. observed Kerley kicking Dever all over her body as she lay on the floor of their home. On another occasion, around Christmas time, Deborah saw Dever

17

with black eyes, a bruised face, and bruises on her back. Dever told Deborah that Kerley had beaten her on the back with a two-by-four.

7. Dever told Fairfield Police Department Officer Harper that Kerley had kicked her in the eye.

8. Desirae C. observed Kerley grab Dever by the back of the head, push her head to the floor, and rub the side of her face and her hair on the floor to mop up water that she had spilled on the floor.

9. In spring 1993, Dever ran from her house into her neighbor's home across the street yelling that Kerley had a gun and was threatening to kill her.

10. On January 7, 1996, Dever told Officer Cross that Kerley had stomped Dever's hand and foot and kicked her in the eye.

Kerley argues many of the uncharged instances of domestic violence were too remote to be admissible and that they were so inflammatory that the jury was likely to have convicted Kerley based on these prior instances rather than on substantive evidence of the charged murder. Kerley also argues that any probative value was substantially outweighed by the time consumed proving and refuting these prior instances. Finally, Kerley argues admission of these prior instances prejudiced him and rendered impossible his chances of getting a fair trial.

In conducting the careful weighing process to determine whether propensity evidence is admissible under section 352, trial courts "must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . ." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

To start our analysis of the balance between probative value and undue prejudice under section 352, we look to the probative value of the evidence. (E.g., *Johnson, supra,*

18

185 Cal.App.4th at pp. 531–533.)  As noted, the Legislature concluded that, in domestic violence cases in particular, a history or pattern of domestic violence is very probative.

" 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity.  Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.  Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' "  (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, pp. 3–4.)  (*Hoover, supra,* 77 Cal.App.4th 1020, 1027–1028.)

Evidence that Kerley abused Dever multiple times is more probative than evidence that he did so once or twice; it is the frequency, regularity, and severity with which Kerley beat Dever that infuses this propensity evidence with probative strength.   (See, e.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 706 (*Cabrera*) ["Here, the probative value of [prior domestic violence Victim 1's] and [prior domestic violence Victim 2's] testimony is principally in its cumulative nature.  Taken together, [Victim 1's] and [Victim 2's] testimony sets forth a continuous and fairly unbroken pattern of domestic abuse which commenced in 1995 and continued until 2002.  The testimony of [the current victim] demonstrated the pattern commenced again when appellant began dating her.  Thus the testimony of [Victim 1] and [Victim 2] was highly relevant and probative because it created a strong inference that appellant had a propensity to commit the acts [the current victim] described"].)  Kerley argued at trial that not one of these alleged prior instances of domestic violence actually occurred; all of the witnesses were lying.  The sheer volume of this testimony from multiple witnesses refuted Kerley's argument.

19

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*Johnson, supra,* 185 Cal.App.4th at p. 531, quoting *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) "Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence." (*Johnson, supra,* 185 Cal.App.4th at p. 531.)

In the present case, Dr. Murad testified, based on his observation that several ribs on Dever's left and right sides had been broken around the time of her death, and based on her damaged hyoid bone, that Dever had been beaten and that her death was a homicide. The jury could conclude, based on this testimony and other evidence, that Kerley had killed Dever by beating her so severely that he broke her ribs and hyoid bone.

Of the 10 instances of domestic violence appellant challenges, nine (numbers 1 through 8 and 10 above) reflect similar assaultive conduct that could have resulted in broken bones. The remaining instance (number 9) in which Dever claimed Kerley had a gun and threatened to kill her was not factually similar to the beating alleged to have caused Dever's death. It was, however, relevant to Dever's fear of Kerley, as discussed in Section VI below.

Kerley's consistent and frequent assaults on Dever in ways that could easily break her ribs and other bones are compelling evidence of his propensity to do just that. Kerley's preferred method of assaulting Dever—kicking her in the stomach and torso, sometimes with steel-toed boots—was remarkable because it was precisely the type of assault that would break ribs. Dever complained that Kerley kicked her in the stomach, beat her in the back with a two-by-four, and apparently broke her ribs. Witnesses saw Kerley kick Dever in the stomach and on other occasions observed bruises to her torso. All of the pathologists agreed that Dever had several ribs that had been broken long before she died. The evidence of Kerley's specific predilection toward kicking Dever in the torso is strikingly similar to the cause of death identified by Dr. Murad.

20

Another factor in the section 352 analysis is the degree of certainty with which the prior instances of domestic violence occurred. (*People v. Falsetta, supra,* 21 Cal.4th 903, 917.) Appellant argues most of the prior instances were observed by Dever's family and friends, who were biased against Kerley and were otherwise impeached by their own conduct. Appellant is correct that five of the ten instances were related by Dever's family members. Incident number 4 was described by Christy H., who had known both Dever and Kerley since childhood.

It is not surprising that the assaults suffered by a victim of domestic violence are most likely to be seen by family members and friends. This does not make their testimony inherently unreliable. Moreover, numerous witnesses observed Dever with black eyes, bruises, and other physical manifestations of abuse. And while the family members likely were biased in favor of Dever, the overwhelming volume and consistency of the domestic violence testimony made for compelling evidence that it was true. To the extent Kerley elicited impeachment evidence as to each witness, the jurors received that evidence and factored it into their credibility findings. The jury apparently did not share Kerley's dim view of the reliability of the witnesses' testimony.

Appellant claims that incidents 1 through 5 above occurred at least 10 years before the charged offense and, therefore, were presumptively inadmissible under section 1109, subdivision (e).[7] The record does not support this claim. Each of the first five incidents is addressed in turn:

1.      Tracy A. testified she saw Kerley throw Dever on the ground and threaten to kill her when Dever was "probably about six or seven months pregnant." Mandee Kerley was born September 28, 1986. Therefore, Dever was "six or seven months pregnant" from approximately June 28 through July 28, 1986. The information alleges Kerley murdered Dever sometime on or after June 14, 1996. Based on the testimony,

---

[7] Section 1109, subdivision (e) provides: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." This particular issue was not raised below, so the trial court did not make any specific findings.

21

therefore, this act of domestic violence occurred less than 10 years before the charged offense.

2.    Similarly, Denae D. testified she saw Kerley punch and kick Dever in the stomach when she (Dever) was "eight or nine months pregnant," which would be August and September 1986, less than 10 years before the charged offense.

3.    Susan D. watched Kerley kick Dever as she lay on the floor of their home. This occurred when "Mandee was only maybe a month old," so after September 28, 1986 and less than 10 years before the charged offense.

4.    Christy H. described two incidents. One when she went to Dever's home and saw that Dever's torso was badly bruised. She testified this was after Mandee was born. The second incident was when Dever came to Christy's house to hide from Kerley, stating that he had just beaten her again. Christy did not give the year of that incident, but said she last saw Dever in approximately 1987. The record does not support Kerley's claim that this incident occurred more than 10 years before the charged offense.

5.    Darla C. observed Kerley restraining Dever by the feet as she was trying to get away from him. This occurred when "Mandee was a baby," so less than 10 years before the charged offense.

Because none of the incidents at issue occurred more than 10 years before the charged offense, they were all presumptively admissible under section 1109, subdivision (a)(1). (See *Fruits, supra,* 247 Cal.App.4th 188, 202, 206; *Johnson, supra,* 185 Cal.App.4th 520, 539.)

In addition, the record reflects that Kerley engaged in a consistent pattern of abusing Dever throughout the 10 years preceding her death. Even if some of the conduct were remote, the evidence hardly suggests Kerley lead a "substantially blameless" life between the early assaults and the death. (See *Johnson, supra,* 185 Cal.App.4th at p. 534.)

Kerley argues the extensive evidence of his prior domestic abuse was likely to confuse, mislead and distract the jurors from their "main inquiry," i.e., deciding whether Kerley murdered Dever. This is a valid concern. (*People v. Falsetta, supra,* 21 Cal.4th

22

at p. 917.) A substantial portion of the People's case was devoted to proving the prior incidents of domestic violence. However, viewing the trial as a whole—including the jury instructions and closing arguments—we find that the charged offense was the primary focus of the trial. Kerley's history of abusing Dever, as noted, comprised a substantial portion of the evidence and argument, but a significantly greater portion of the evidence was devoted to proving the charged crime.

Moreover, propensity evidence under section 1109 is directly relevant to this "main inquiry." The very reason the Legislature authorized admission of prior domestic violence evidence was to enable the jury to conclude that the defendant had a propensity to abuse his partner and, based on that propensity, that he was likely to, and did in fact commit the charged crime. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1014 (*Reliford*); *People v. Brown, supra,* 192 Cal.App.4th 1222, 1235–1237.) The prior instances are not sufficient by themselves to prove the charged crime, but the fact that defendant regularly assaulted the victim is evidence the jury can use to conclude, along with other evidence, that the defendant assaulted the victim in committing the charged crime. Kerley cites no case holding the jury is not permitted to consider section 1109 propensity evidence in determining whether the defendant committed the charged crime—that is precisely the reason the Legislature made it admissible in the first place.

Kerley notes that he was previously convicted for only one of the 10 prior instances of domestic violence. He is correct that this is a relevant factor in the section 352 analysis—the concern is that a jury might convict a defendant to punish him for the uncharged acts, rather than because the evidence is sufficient to prove the charged crime. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [addressing evidence of uncharged acts admitted under section 1101, subdivision (b) before section 1109 was enacted].) Viewing the trial as a whole, however, it is unlikely that the jury would have been confused on whether it was deciding whether to convict Kerley for murdering Dever or for assaulting her in the past. (See *People v. Loy* (2011) 52 Cal.4th 46, 74–76 (*Loy*).) And while the litany of abuse Dever suffered at Kerley's hands is disturbing, it is not likely a jury would

23

be more emotionally upset that he beat and kicked her than it would be that he beat her to death and dumped her naked body in a remote ditch.

Kerley also argues that the prior acts of domestic violence were much more inflammatory than the charged offense, which would likely cause the jury to decide the murder charge based on the emotional pull from the history of domestic violence rather than from the evidence that he killed Dever.

As noted, the evidence of prior incidents of domestic violence was substantial and compelling. The jurors learned that, over a period of 10 years, Kerley regularly punched and kicked Dever, slapped her, threw her to the ground when she was pregnant, punched and kicked her in the stomach when she was pregnant, restrained her from leaving the home, stalked her, beat her in the back with a two-by-four, kicked her in the eye, mopped the floor with her face and hair, stomped on her hand and foot, and repeatedly threatened to kill her. The jurors also learned that Kerley demanded Dever procure a woman with whom he and Dever could have three-way sex, had held a firearm to the head of a prior sex partner, and kicked Dever in the eye for failing to locate a partner.

Most of this evidence was damaging to Kerley's case because it presented compelling evidence of his propensity to beat Dever. As noted, however, this type of "prejudice" is not the "prejudice" envisioned by section 352. The frequency and regularity with which Kerley beat Dever provided vivid proof that he would likely beat Dever again. The severity and viciousness with which he assaulted Dever was probative of the intensity and depth of his willingness to harm her. This is all probative evidence relevant to the jury's determination whether Kerley committed the charged crime, not "undue prejudice" within the meaning of section 352. (*Fruits, supra,* 247 Cal.App.4th at p. 205; *Cabrera, supra,* 152 Cal.App.4th 695, 706.)

On the other hand, evidence that Kerley demanded that Dever procure a woman with whom they could have sex, and his prior conduct of holding a gun to Trudy's head during their sexual encounters, was the type of "undue prejudice" to which section 352 applies. Kerley's sexual deviance, and his use of a firearm in pursuit of these sexual desires, do not tend to prove that Kerley was likely to beat Dever. Therefore, they carried

no probative value on a relevant issue, but did introduce unduly prejudicial evidence against Kerley. The question is whether this portion of the evidence, in the context of the trial as a whole, was likely to cause the jury to convict Kerley of murder based on its emotional reaction to his deviant sexual desires rather than on the evidence that Kerley assaulted Dever and caused her death. We address this issue in Section XII below.

### III. The Jury Instructions Regarding the Uncharged Domestic Violence Did Not Impermissibly Lower the Prosecution's Burden of Proof

The jury was given the following instruction regarding the uncharged domestic violence evidence, which is part of CALCRIM No. 852: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] *Domestic violence* means abuse committed against an adult who is a spouse, cohabitant, person with whom the defendant has had a child, or person who dated or is dating the defendant. [¶] *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] The term *cohabitants* means two unrelated persons living together for a substantial period of time, resulting in some permanency of the relationship. Factors that may determine whether people are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same residence, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) the parties' holding themselves out as husband and wife, (5) the parties' registering as domestic partners, (6) the continuity of the relationship, and (7) the length of the relationship. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true."

25

For reasons that are not clear from the record[8], neither the written nor the oral version of the instructions included these additional paragraphs from CALCRIM No. 852: "If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit [and did commit] _____ <insert charged offense[s] involving domestic violence> , as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of _____ <insert charged offense[s] involving domestic violence>. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt."

The jury was also instructed consistently and repeatedly that the People had the burden of proving each element of the charged crime of murder beyond a reasonable doubt.

On appeal, Kerley argues that the partial CALCRIM instruction No. 852 that was given erroneously permitted the jury to convict him of murder based on a preponderance of the evidence, and that it erroneously permitted the jury to consider prior acts of domestic violence to prove Dever's cause of death. Defense counsel did not object to the instruction as given before the trial court, but because Kerley argues that the instruction violated his constitutional rights by lowering the prosecution's burden of proof, we will consider his argument on the merits. (See Pen. Code, § 1259; *People v. Orellano* (2000) 79 Cal.App.4th 179, 181 fn. 1 (*Orellano*).)

Our Supreme Court considered a similar instruction in *Loy, supra,* 52 Cal.4th 46. The instruction given there contained language similar to the language omitted here: " 'If you find the defendant committed a prior sexual offense or sexual offenses, you may, but

_____

        [8] In discussing the jury instructions, the trial court and counsel appeared to refer to the full version of the instruction.

are not required to, infer that the defendant had a disposition to commit the same or a similar type sexual offense. If you find that the defendant had this disposition, you may, but are not required to, infer he was likely to commit *and did commit* the crime of which he's accused.' " (*Loy*, *supra*, 52 Cal.4th at p. 71)

The Supreme Court noted that it had, in *Reliford, supra,* 29 Cal.4th 1007, upheld this same instruction with the following additional language: " 'However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime. The weight and significance of the evidence, if any, are for you to decide.' " (*Reliford*, *supra*, 29 Cal.4th at p. 1012.)

In *Loy,* the Supreme Court noted that, before the addition of this language to the standard instruction in 1999, the courts of appeal had divided on whether the instruction was constitutional. Several courts concluded it was not, and these are the cases upon which Kerley relies here. (*Id*. at pp. 72–74.) However, the Supreme Court in *Loy* found that, "under the facts and overall instructions of this case," the cases concluding that the pre-1999 version of the instruction was constitutional "have the better view," and that the additional admonishment upheld in *Reliford* was not necessary to render the instruction constitutional. (*Id*. at p. 74.)

In *Loy*, *Reliford*, and the court of appeals cases finding the pre-1999 version of the instruction unconstitutional, the challenged language told the jury that it " 'may . . . infer [the defendant] was likely to commit *and did commit* the crime of which [he is] accused.' " (*Loy*, *supra*, 52 Cal.4th at p. 71; see *Reliford*, *supra*, 29 Cal.4th at pp. 1011–1013; *People v. Younger* (2000) 84 Cal.App.4th 1360, 1379–1383; *People v. James* (2000) 81 Cal.App.4th 1343, 1349–1356; *Orellano, supra,* 79 Cal.App.4th 179, 184–185; *People v. Vichroy* (1999) 76 Cal.App.4th 92, 98–100; *Gibson v. Ortiz* (9th Cir. 2004) 387 F.3d 812, 821–823; *Doe v. Busby* (9th Cir. 2011) 661 F.3d 1001, 1008–1009, 1023.) The concern identified in these cases was that the language above "allowed the jury to find that [the defendant] committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the *charged* acts

27

based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." (*Gibson v. Ortiz, supra*, 387 F.3d at p. 822.)

We conclude that the instruction, as given here, did not permit the jury to convict Kerley of murder based on a preponderance of the evidence. As in *Loy*, the "court merely told the jury it could not consider the evidence of the prior [acts of domestic violence] for *any* purpose unless it found he had committed them by a preponderance of the evidence. Nothing in that instruction canceled the reasonable doubt instructions the jury also received." [9] (*Loy, supra*, 52 Cal.4th at p. 76.) " 'Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed [prior acts of domestic violence].' " (*Ibid.*) Instead, the instructions as a whole repeatedly " 'explained that, in all other respects, the People had the burden of proving defendant guilty 'beyond a reasonable doubt.' " (*Loy, supra*, 52 Cal.4th at p. 76; quoting *Reliford, supra*, 29 Cal.4th at p. 1016.)

Moreover, the incomplete jury instruction actually given in this case *omitted* the very language that arguably could lead a jury to convict the defendant of the charged crime based upon the lower standard of proof. The jury in the present case was *not* told it may infer from the prior acts of domestic violence that the defendant "was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit *and did commit*" the charged murder. (CALCRIM No. 852.) The instruction actually given here was *less* likely to suggest the jury could convict the defendant based on a preponderance of the evidence than the one given in *Loy*.

We likewise see no error in the prosecutor's statement to the jury that "[i]n domestic violence cases other acts of domestic violence are relevant and admissible to

---

[9] The instruction in *Loy* told the jury it could not "consider the evidence . . . for *any* purpose," whereas the instruction here did not contain "for any purpose" and simply stated that the jury could not "consider this evidence" unless it found the uncharged acts proven by a preponderance. (See *Loy, supra*, 52 Cal.4th at p. 76.) This omission does not change our analysis.

show continuous domestic violence and, in this case, the ultimate act of domestic violence is when the defendant killed his live-in girlfriend." The jury was indeed permitted to infer from the prior acts of domestic violence that Kerley had the disposition to commit the charged offense, and that he was likely to do so. (See *Reliford*, *supra*, 29 Cal.4th at p. 1014 ["*evidence* of the uncharged offense may support the *inference* that defendant had a disposition to commit the charged offense which, in turn, may support the *inference* that he was likely to commit and did commit the charged offense"]; *People v. Brown, supra,* 192 Cal.App.4th 1222, 1237 ["a defendant's propensity to commit domestic violence . . . is relevant and probative to an element of murder, 'namely, [defendant's] intentional doing of an act with malice aforethought that resulted in the victim's death' "].) Nothing in the prosecutor's statement suggested that the preponderance of evidence standard was applicable to any element of the charged offense. We conclude that the instructions as given did not violate Kerley's constitutional rights by lowering the prosecution's burden of proof.[10]

## IV.  *The Admission of Certain Statements of the Deceased Did Not Violate* **Crawford v. Washington**

Kerley argues the trial court violated *Crawford, supra,* 541 U.S. 36 by admitting over his objection testimonial statements Dever made to police officers on two occasions, December 24, 1989 and January 7, 1996. The People respond that Kerley's argument is foreclosed by the doctrine of forfeiture by wrongdoing, that Dever's statements on both occasions were properly admitted without violating *Crawford*, and that, in any event, admission of these two statements, even if error, was harmless error.

### A.  *Factual Background*

#### 1.  *1989 Statements to Officer Harper*

---

[10]  For similar reasons, we reject Kerley's argument that the instruction impermissibly allowed the jury to consider evidence of uncharged domestic violence to prove that "an assaultive crime occurred in the first place and that defendant committed it." The uncharged domestic violence was relevant to this issue, and, as discussed above, there was sufficient evidence for the jury to conclude that Dever was murdered.

On December 24, 1989, Dever called a neighbor, Kimberly R., and in a coded message told her Kerley was assaulting her and asked Kimberly to come to the house. Kimberly called the police.

Fairfield Police Officers Caree Harper and Carol Edmonds responded at approximately 1:00 a.m. When they arrived at Kerley's residence, the officers heard a woman yelling "Trudy, Trudy." The screaming intensified as they approached the front door. The officers knocked and yelled, " 'police.' " Kerley opened the door, said, " 'Everything is fine,' " and slammed the door in the officers' faces. The screaming continued. Officer Edmonds warned if Kerley did not open the door, they would break the front window of the house. When Kerley failed to open the door again, the officers broke out the front window and pulled Dever out through the opening.

Dever was hysterical, frantic, scared, panicked, and crying. She screamed, " 'Hurry, I know he is going to kill me.' " Dever had a cut above her left eye, an injury behind her left ear, and injures to her right ring finger and thigh. Officer Harper brought Dever out to the street in front of the house. Dever began to run around screaming, so Officer Harper placed her in the back of a patrol car for safety. Kerley never came out of the house. The officers were unable to arrest Kerley because their Sergeant ordered them to clear the scene.

Officer Harper drove Dever to the police station to take her statement. On the way to the police station, Dever told Officer Harper that she (Dever) was concerned for her safety and for the safety of her daughter. Dever wanted to return to get her daughter from the daughter's paternal grandparents. Dever spent at least a couple of hours at the police station. Although Dever stopped yelling, she never calmed down that day.

On direct examination, the People elicited from Officer Harper only the portions of Dever's statements described above. On cross-examination, Kerley's counsel suggested that Trudy may not even exist. When counsel asked her if she had ever talked to anyone named "Trudy," Officer Harper responded, "I never talked to Trudy. I was told about Trudy from Ms. Dever."

30

On redirect examination, the prosecutor asked Officer Harper to relate Dever's explanation of why Kerley had beaten her as it related to Trudy. Kerley's counsel objected. The trial court overruled the objection on the ground that counsel had opened the door to this topic. Officer Harper testified Dever said Kerley wanted her to find another woman to have sex with so Kerley could watch, but Dever was not able to find someone. Dever said Trudy had done it a couple of times, but Kerley had held a gun to their heads and was too violent, so Trudy declined to return. That evening, they had gone to a club named Pure Energy to find another woman, but Dever was unsuccessful in finding one. When they returned home, Kerley said, " 'you deserve this' " and, from a standing position, kicked Dever in the head and eye.

### 2. *1996 Statements to Officers McCoy and Cross*

The second incident occurred January 7, 1996. At 5:40 p.m., Fairfield Police Officer McCoy responded to a domestic violence call at Kerley's residence. When he knocked on the front door, Dever answered. She had two black eyes and a puffy and swollen face. She was trembling and crying uncontrollably and had a look of "stark raving terror" on her face. Dever reached for Officer McCoy's hand and then jumped onto him, wrapping her arms around his neck and her legs around his waist. Shaking uncontrollably, Dever said, " 'Help me, help me, save me, save me, he did this.' " Kerley was standing in the doorway. Officer McCoy was not able to pry Dever from his torso until they walked out to the patrol car in front of the house.

Officer McCoy had Dever sit in the back of his patrol car. She was still shaking. She said Kerley had assaulted her; he was mad at her for gaining weight. Dever told Officer McCoy Kerley had a gun by the doorway. When Officer McCoy returned to the house, he found the gun in the doorway and observed Mandee (age eight or nine) in the house.

Officer Julie Cross arrived about 14 minutes after the domestic violence dispatch call. When she arrived, Dever was in one patrol car and Kerley was in another. Officer Cross spoke with Dever in the patrol car. Dever's makeup was smeared and she looked like she had been crying. Officer Cross could see that Dever's eyes were blackening and

31

her wrist and ankle were a little red and swelling. Officer Cross was trying to get both sides of what had happened at the residence. Over Kerley's objection, Officer Cross testified Dever said she and Kerley were arguing, she went to the floor, and Kerley stomped on her right hand and foot and kicked her in the eye. Dever said when she tried to call 911, Kerley said if anyone from the police department came to the house, he would kill Dever.

Kerley was arrested and taken to the police station. After waiving his *Miranda* rights, Kerley told Officer Cross that Dever had run out of the house, hit a wooden fence, and then scratched and hit herself, injuring her eye, wrist, and foot. As Dever was scratching and hitting herself, she said Kerley didn't love her any more. Although they had argued, there was no physical fight. Kerley said, " 'If I'm so bad, why does she keep coming back. I didn't lay a hand on her.' "

### B. Applicable Law

#### 1. Crawford

Under the Sixth Amendment to the United States Constitution, a defendant in a criminal case has the right to be confronted with the witnesses against him. In *Crawford, supra,* 541 U.S. 36, the Court held the Sixth Amendment confrontation clause bars the admission of testimonial statements by a non-testifying witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. (*Id.* at pp. 61–68.) In *Crawford*, the Court did not fully define "testimonial" statements, but noted they include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogation." (*Id.* at p. 68.)

The Court further defined "testimonial" in a pair of cases decided together, *Davis v. Washington* and the companion case of *Hammond v. Indiana* (2006) 547 U.S. 813 (*Davis*). Addressing statements made by victims of domestic violence to law enforcement officers, the Court in *Davis* explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there

is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822.) Therefore, the victim's call to 911 in *Davis*, made as she was being attacked by the defendant, was non-testimonial despite the fact that the victim responded to questions from the 911 operator. (*Id.* at pp. 817, 828.)

In the *Hammond* case, police officers responding to a domestic disturbance call found the victim alone on the front porch. She appeared frightened, but told the officers nothing was the matter. The officers found the defendant inside the house. One officer remained with the defendant in the kitchen while another interviewed the victim in the living room. The victim told the officer the defendant had pushed her to the ground, shoved her head into broken glass, and twice punched her in the chest. The victim's statements were memorialized in a " 'battery affidavit.' " (*Davis, supra,* 547 U.S. at pp. 819–820.) When the victim did not appear at trial, the officer recounted her statements for the jury. (*Id.* at p. 820.)

The Supreme Court held the *Hammond* victim's statements to the police were testimonial—and therefore inadmissible without cross-examination—because there was no emergency in progress. When the officers arrived, they did not hear arguing or things being broken and did not see anything being thrown or broken. The victim was alone on the front porch and stated there was no problem. When the officer interviewed the victim in the living room—where he obtained the challenged statements—"he was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime–which is, of course, precisely what the officers *should* have done." (*Id.* at pp. 829–830.)

In *People v. Cage* (2007) 40 Cal.4th 965 (*Cage*), our Supreme Court applied *Crawford, Davis,* and *Hammond* in a child abuse case. The defendant in *Cage* was convicted of aggravated assault for slashing her 15-year-old son across the face with a shard of glass while her mother held the child down. (*Id.* at pp. 970, 972.) The victim was taken to a hospital, where a surgeon asked him for purposes of treating him, "what

33

happened?" The victim responded " 'he had been held down by his grandmother and cut by his mother.' " (*Id.* at p. 972.)

A police officer interviewed the victim in a waiting room of the emergency department before he was treated. The officer asked the victim " 'what had happened between [him] and the defendant.' " The victim responded he and his mother had gotten into an argument and his mother pushed him, causing him to fall backward onto a coffee table and break its glass top. His grandmother then held him as his mother picked up a piece of broken glass and cut him. (*Cage, supra,* 40 Cal.4th at p. 971.) After the victim was released from the hospital, the police officer conducted a tape-recorded interview with him at the police station. The victim gave a more detailed account of the attack. (*Id.* at pp. 972–973.) The victim did not testify at trial. His statements to the surgeon and both statements to the officer were introduced into evidence at trial. (*Id.* at pp. 972–974.)

The California Supreme Court reviewed *Crawford, Davis,* and *Hammond* and distilled the following principles: "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Id.* at p. 984.) Based on these principles, the court held the victim's statements to the officer who

34

interviewed him in the hospital emergency waiting room and at the police station were testimonial. (*Ibid.*) The incident leading to the injury had been over for more than an hour. The assailant was far away. The victim was in no danger of further assault by his mother. (*Id.* at p. 985.)

On the other hand, the victim's statements to the surgeon were non-testimonial, and therefore admissible pursuant to an Evidence Code hearsay exception. The primary purpose of the surgeon's question, objectively viewed, was to gather information needed for proper diagnosis and treatment, not to establish past facts for possible use in a criminal trial. (*Cage, supra,* 40 Cal.4th at p. 986.)

The United States Supreme Court further elucidated the definition of "testimonial" in *Michigan v. Bryant* (2011) 562 U.S. 344 (*Bryant*). In *Bryant*, police officers responded to a dispatch indicating that a man had been shot. When they arrived, they found the victim lying on the ground of a gas station parking lot with a gunshot wound to his abdomen. The officers asked him " 'what had happened, who had shot him, and where the shooting had occurred.' " The victim responded by naming his assailant and describing the circumstances leading to his having been shot. The conversation was interrupted within five to ten minutes when emergency medical services arrived. The victim died. (*Id.* at p. 349.)

The court held the victim's statements to the officers at the scene were non-testimonial. The circumstances surrounding the interaction between the victim and the officers objectively indicated that the primary purpose of the questioning was to enable the police to meet an ongoing emergency. (*Bryant, supra,* 562 U.S. at pp. 349, 378.) The court clarified that the trial court is to apply an objective standard based on all relevant circumstances and to consider the perspectives of both the questioner and the declarant. (*Id.* at pp. 360, 375–376.)

2.  *Forfeiture by Wrongdoing*

35

The United States Supreme Court has identified only two circumstances in which testimonial statements not subject to cross-examination can be admitted into evidence without offending the confrontation clause:  dying declarations and forfeiture by wrongdoing.  The latter doctrine dictates that a defendant forfeits his Sixth Amendment right to confront a witness against him when he by a wrongful act makes the witness unavailable to testify at trial.  (*Giles v. California* (2008) 554 U.S. 353, 355, 358 (*Giles*).)  In *Giles,* the Court held that the doctrine of forfeiture by wrongdoing permits admission of unconfronted statements of an unavailable witness only if the trial judge finds by a preponderance of the evidence that the defendant by a wrongful act made the witness unavailable with the intent of preventing the witness from testifying.  (*Id.* at pp. 358– 368.)  The goal of the doctrine was to remove the "otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of the courts to protect the integrity of their proceedings.' " (*Id.* at p. 374.)

In *Giles,* the Court addressed application of the doctrine specifically to domestic violence cases:  "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions.  Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine.  Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify."  (*Giles, supra,* 554 U.S. at p. 377.)  Thus, the doctrine applies to evidence the defendant intended to dissuade the victim from reporting the abuse to law enforcement authorities as well as from testifying at trial.  (*People v. Banos* (2009) 178 Cal.App.4th 483, 502 (*Banos*).)

36

The forfeiture by wrongdoing doctrine is codified in section 1390.[11] Section 1390, subdivision (a) provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." The section further requires that the proponent of the hearsay statement establish by a preponderance of the evidence at a foundational hearing that the requirements of subdivision (a) have been met. (§ 1390, subd. (b)(1).) Although the hearsay statement the proponent seeks to offer is itself admissible at the foundational hearing, and, therefore, can be considered in determining whether the prerequisites of subdivision (a) have been met, the hearsay evidence at issue cannot be the sole basis for this finding; it must be supported by independent corroborative evidence. (§ 1390, subd. (b)(2).) The trial court, in deciding whether to admit the hearsay statement, may take into account whether it is trustworthy and reliable. (§ 1390, subd. (b)(4); see *People v. Jones* (2012) 207 Cal.App.4th 1392, 1398 (*Jones*).)

### C. Analysis

#### 1. Whether Dever's Statements Were Testimonial

##### a. 1989 Statements to Officer Harper

Dever's statements to Officer Harper and Officer Edmonds as they were pulling her out of the living room window, "Hurry, I know he's going to kill me," were not testimonial. The officers arrived to find an argument in progress, featuring Dever yelling "Trudy, Trudy" with increasing intensity. When they knocked, Kerley opened the door, said, " 'Everything's fine,' " and slammed the door in the officers' faces. That left an apparent domestic violence victim trapped in the house with her likely abuser, who refused to let the officers determine the victim's wellbeing. The officers demanded Kerley open the door. He did not. The officers were so concerned about Dever's safety,

---

[11] Section 1390 became effective January 1, 2011, so it applied to Kerley's 2013 trial. (§ 1390, subd. (c).) In the trial court, both parties argued the applicability of the doctrine of forfeiture by wrongdoing, citing *Giles* and *Banos*. However, neither party cited section 1390 in the trial court or in their briefs on appeal to this court until we requested supplemental briefing on this issue.

they broke out the front window and dragged her out through the window. They could see Dever was injured around her eye. The officers asked no questions. Dever—who was hysterical, frantic, scared, panicked, and crying—begged the officers for help because she believed Kerley was going to kill her. This was an ongoing, unresolved, and dangerous emergency situation. The officers were not investigating past acts of domestic violence; they were providing emergency help to a presumed victim of presently ongoing domestic violence. Kerley was in the house, where he was able to continue the assault, grab a weapon, or attack the officers. The officers' goal was to address the ongoing emergency and render everyone safe. Dever's motivation was to get help from the officers and to stay alive. When all circumstances are viewed objectively, Dever's plea for help to prevent Kerley from killing her was non-testimonial within the meaning of *Crawford*. (*Bryant, supra,* 562 U.S. at p. 361; *Davis, supra*, 547 U.S. at p. 828; *Cage, supra,* 40 Cal.4th at p. 986.)

However, Dever's statements to Officer Harper at the police department were clearly testimonial. Dever had been removed from the scene of the violence. She never did completely calm down that evening, but she was no longer hysterical and yelling. (Cf. *Banos, supra,* 178 Cal.App.4th 483, 498 [although domestic violence victim was still "excited" and "upset," statements to police officer after the emergency was over were testimonial].)

Although Kerley was not in custody, he presented no danger to Dever in the police station. Officer Harper conducted a standard post-incident interview of a domestic violence victim in order to establish and document what had happened at the house. Although the timing and duration of the interview are not clear from the record, Dever was at the police station for approximately two hours. Viewing all of the circumstances objectively, it is clear the primary purpose of the police station interview was to gather evidence of past events for possible use in a criminal prosecution. This interview is indistinguishable from the police interviews in *Crawford*, *Hammond,* and *Cage*.

### b.   1996 Statements to Officers McCoy and Cross

38

The statements Dever yelled to Officer McCoy as she jumped onto him and held on for dear life—" 'Help me, help me, save me, save me, he did this' "—were non-testimonial. Again, the officers were called to a home on a report of domestic violence. They had no idea what to expect. When Officer McCoy knocked on the door, Dever opened the door. Kerley was in the house behind her. Dever had two black eyes and was crying and shaking uncontrollably. Before the officers could ask any questions, Dever jumped onto Officer McCoy, wrapping her arms and legs around him. Officer McCoy could not pry her free, so he had to walk with her latched onto him to a patrol car in front of the house before he could release her.

Dever was still shaking when she got to the police car. Dever said Kerley beat her because she had gained weight.[12] She also informed Officer McCoy that Kerley had a gun in the house right next to the door where he was standing. These statements were also non-testimonial. The officers had just arrived, apparently during or shortly after an assault, and had no time to determine what they had on their hands. Before they could begin to sort out what was going on, or even whether a crime had been committed, Dever—still shaking—told Officer McCoy what had happened and warned him of the danger the gun posed to all of them. Again, there is no evidence these statements were in response to questioning; they appear to have been volunteered by Dever. Kerley was still in the house unrestrained with immediate access to a firearm. Officer McCoy returned to the house and found the firearm right where Dever had said it was. He was still dealing with an ongoing, unstable, and dangerous situation. Based on all of the relevant circumstances, Dever's statements to Officer McCoy at the door and in the car were non-testimonial. (*Bryant, supra,* 562 U.S. at p. 361; *Davis, supra*, 547 U.S. at p. 828; *Cage, supra,* 40 Cal.4th 965, 986.)

Dever's later statements to Officer Cross, however, were testimonial. Officer Cross arrived approximately 14 minutes after the dispatch. By then, Kerley had been placed in the back of a patrol car. Dever was in a second car. Officer Cross spoke to the

_____

[12] The trial court sustained an objection to additional statements Dever made explaining why Kerley had beaten her.

39

officers on scene, and then went to speak with Dever in order to get both sides of what had happened.  At that point, the emergency was over.  Kerley and Dever were physically separated.  Kerley had no access to his guns.  Dever was in no immediate danger from Kerley.  Officer Cross was conducting an interview to gather facts about past events for potential use in a criminal investigation.[13]  Again, the circumstances of this interview are indistinguishable from the questioning of the victim in the *Hammond* case.  (*Davis, supra*, 547 U.S. at pp. 829–830.)

### 2.  *Opening the Door*

The People argue Kerley opened the door to admission of Dever's testimonial hearsay describing the reasons Kerley kicked her in 1989; that is, by asking on cross-examination whether Officer Harper had ever spoken with Trudy, Kerley waived his right to object to Dever's explanation on redirect that Kerley had kicked her because she failed to find a woman with whom they could have sex in place of Trudy.  On this basis, the trial court overruled Kerley's objection to elicitation of this testimony.  Kerley argues this was error, because his cross-examination of Officer Harper on whether she had ever spoken to Trudy did not leave a misleading impression that could only be corrected by admission of Dever's statements.

Under the doctrine of "opening the door," one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression.  (E.g., *People v. Hart* (1999) 20 Cal.4th 546, 653; *People v. Jordan* (2003) 108 Cal.App.4th 349, 365–366.)  A trial court's ruling on whether rebuttal evidence is admissible on this theory is reviewed for abuse of discretion.  (*Hart, supra,* 20 Cal.4th at p. 653.)

---

[13]  Kerley suggests the mere fact that Officer Cross testified she wanted to find out "what had happened" renders any subsequent statement testimonial.  This phrase does not have such talismanic properties; the phrasing of the question is only one factor in the analysis.  In several cases, statements were found not to be testimonial even though they followed the question, "What happened?"  (E.g., *Bryant, supra,* 562 U.S. 344, 349 [officers asked, " 'what had happened, who had shot [the victim], and where the shooting had occurred' "; subsequent responses were non-testimonial]; *Cage, supra,* 40 Cal.4th 965, 986 [surgeon's asking, "what happened" did not render answer testimonial].)

We conclude the trial court abused its discretion in ruling that the door had been opened to the details about Kerley kicking Dever in the head because she was unable to find a sex partner to replace Trudy. Kerley's question of Officer Harper—"So you never talked to anyone named Trudy?"—elicited the responsive answer, "I never talked to Trudy" and the non-responsive answer, "I was told about Trudy from Ms. Dever." While there was no objection to the non-responsive portion of Officer Harper's answer, it did not open the door to everything Dever said in connection with Trudy. Assuming Trudy did exist and, therefore, the suggestion on cross that she may not exist was misleading, Dever's description about having had sex with Trudy and Kerley in the past, Kerley's use of a firearm during sex, Kerley's demand that Dever obtain another woman for sex, and the fact that Kerley kicked Dever in the head for failing to do so was not necessary to rebut this misleading impression. None of these details confirmed Trudy's existence and most were irrelevant to Trudy's existence. The trial court, therefore, erred in admitting this testimony on the theory that Kerley opened the door to its admission. (*People v. Hopson* (2017) 3 Cal.5th 424, 439–443.)

### 3. *Forfeiture by Wrongdoing*

Prior to trial, the People filed an in limine motion to admit Dever's out-of-court statements as spontaneous statements pursuant to section 1240 and to prove her state of mind pursuant to section 1250. The People made a detailed proffer based on the testimony presented to the grand jury. When the motion was heard, the People also argued that all of Dever's statements were admissible under the doctrine of forfeiture by wrongdoing, as well as sections 1240 and 1250. Kerley opposed the admission of this testimony on all grounds, including forfeiture by wrongdoing.

During argument on the issue of forfeiture by wrongdoing, the trial court observed that, as to the 1989 incident, based on Kerley's conduct of opening the front door, seeing the police officers, and slamming the door in their faces, saying, " 'Everything is fine' " and " 'We've got to talk it over,' " one could infer he wanted to prevent Dever from talking to the police. Regarding the second incident from 1996, the court opined that, if Dever had said "Yeah, he doesn't want me to talk to you. He doesn't want me to tell

41

anyone," then the forfeiture by wrongdoing exception would probably apply, citing *Banos, supra,* 178 Cal.App.4th 483.[14] After extensive argument, the trial court ruled that the bulk of Dever's statements was admissible pursuant to sections 1240 and 1250. The court cited *Banos* and described its holding, but did not specifically rule at this point on the forfeiture by wrongdoing issue.

However, during the trial, after most of the evidence had been presented, the trial court overruled a defense objection to admission of one of Dever's statements on the grounds that a reasonable juror could find that Kerley had caused Dever to be unavailable by killing her.

Under section 1390, the People were required to establish by a preponderance of the evidence in a foundational hearing that Kerley had engaged in wrongdoing (murdering Dever) that was intended to, and did, make her unavailable as a witness. (§ 1390, subds. (a) and (b)(1)). Dever's hearsay statements themselves could be used to establish these elements at the foundational hearing, but the elements could not be met solely on the basis of Dever's hearsay statements; they had to be supported by independent corroborative evidence. (§ 1390, subd. (b)(2).)

As part of motions in limine, the People filed a written proffer in support of their motion to admit Dever's statements pursuant to sections 1240 and 1250. This proffer included the following evidence culled from the grand jury testimony:

1. Nancy F., Kerley's former girlfriend, testified before the grand jury that Kerley was very controlling in that he watched where she went, what she did and to whom she spoke. During their relationship, he had hit, kicked, and punched her and handcuffed her to a bed. Kerley was once arrested for assaulting Nancy. Nancy wrote a letter to the District Attorney asking that charges be dismissed. She did so because she feared Kerley; he had threatened to kill her in the past.

---

[14] As detailed above, officer Cross later testified Dever told her that, when she (Dever) tried to call 911 during the January 7, 1996 assault, Kerley said he would kill her if the police came to the house in response to her call.

42

2. Susan D., Dever's step-mother, saw Kerley punch and kick Dever in the face and body. As Kerley was beating Dever, Kerley's mother took Mandee out of the house. Kerley told Dever that, if she ever wanted to see Mandee again, she would have to return to him. Dever feared Kerley and tried to leave him several times. Each time she did so, Kerley contacted the family within hours to find her.

3. Dever's sister, Deborah M., testified Kerley was very controlling and would not allow Dever to go anywhere or to see family. The only time the family saw Dever was when she tried to escape from Kerley. Dever was terrified of Kerley and feared he would kill her. She said if she ever disappeared, Deborah should have the backyard dug up. Deborah often saw Dever with black eyes, bruises, and other injuries.

4. Another sister, Denae D., saw Kerley assault Dever when she tried to leave him. Dever expressed fear that Kerley would kill her.

5. On December 24, 1989, Dever's neighbor, Kimberley R., called the police for Dever when Dever told her Kerley had kicked her in the face. Dever went to live with family members for a period of time after this incident. Dever told Kimberly she wanted to leave Kerley, but that she was afraid of him. Dever asked Kimberly to come check on her if she did not see Dever for a few days because she may be handcuffed inside the house. On one occasion, Kimberly took Dever and Mandee to her (Dever's) father's house because Dever wanted to get away from Kerley.

6. On December 24, 1989, Kerley slammed the door in Officer Harper's face when she responded to a domestic violence call and heard Dever screaming in the home. Kerley refused to open the door as demanded by the officers. After they broke a window and dragged Dever out of the home, Kerley disregarded orders to come out of his house.

7. About six months before Dever disappeared, Desirae C. saw Kerley force Dever's head to the floor to mop up spilled water with her hair. She watched as Kerley told Dever she would never leave him. If she did, he would find her wherever she went. " 'If you leave me, they will never find your body. I'll dig this backyard up, and I'll bury you so deep they'll never [find] your body.' "

43

8. On January 7, 1996, Dever, with two black eyes and a puffy face, jumped on Officer McCoy yelling, " 'Help me, save me. He did this to me.' " " 'He has a gun.' " She later told Officer Cross, in one of the testimonial statements at issue, that Kerley had threatened to kill her. Kerley claimed Dever had inflicted the injuries on herself.

9. Kerley was arrested and charged with domestic violence as a result of this January 7, 1996 incident. On January 12, 1996, Dever appeared at the police department and asked that the charges against Kerley be dropped. In arguing the forfeiture by wrongdoing issue, the prosecutor proffered that Kerley had a court date on the pending felony domestic violence case June 19, 1996. Dever went missing five days before this court appearance.

10. In spring 1993, Dever ran out of her house and straight into a neighbor's house yelling, " 'He's going to kill me, he's going to kill me, he's got a gun.' " Dever begged her neighbors, Richard H. and his wife, not to call the police because Kerley would hurt her if she did.

11. Laura K., who married Kerley shortly after Dever disappeared, told the grand jury that Kerley threatened to kill Laura and her son if she ever left him. She wanted to call the police on Kerley several times, but he would take the phone away from her.

In short, the People's proffer showed that Kerley isolated Dever from family and friends to keep her from seeking outside help; discouraged her from calling the police, reporting her abuse to authorities, or cooperating in a prosecution; and knew she was a likely witness in his pending felony prosecution for beating her up on January 7, 1996. Based on the information contained in the People's proffer alone, the trial court easily could have found Kerley killed Dever with the intent to prevent her from reporting his abuse to the police and from testifying against him in his upcoming criminal case. (*Banos, supra,* 178 Cal.App.4th 483, 502–503.) As the Supreme Court articulated in *Giles*, in the context of domestic violence cases, "[w]here such an abusive relationship culminates in murder, *the evidence may support a finding that the crime expressed the*

44

*intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine.* Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.*"* (*Giles, supra,* 554 U.S. at p. 377 (italics added).) Kerley had controlled and isolated Nancy F. before Dever and Laura K. after her. He kept Dever from seeing her family and friends. Kerley clearly communicated to Dever that, if she called the police, he would kill her. Kerley was facing felony domestic violence charges for assaulting Dever and had an impending court date when she disappeared. Dever obviously would have been the key witness against him.

The People's proffer contained abundant evidence independent of Dever's hearsay statements to corroborate that Kerley killed her to keep her from reporting him to the police and testifying against him in court. Of the evidentiary points summarized above, numbers 1, 2, 4, 6, 7, 8, 9, and 11 were based in whole or in part on percipient observations by witnesses other than Dever. The independent corroboration requirement of section 1390, subd. (b)(2) was comprehensively satisfied.[15]

The evidence presented during the trial supplied further basis for concluding that Kerley killed Dever, at least in part, to prevent her from reporting his abuse to the police, and to keep her from testifying against him in the pending criminal case.[16] At trial,

---

[15] Kerley argues that, under section 1390, subdivision (b)(2), each of Dever's hearsay statements must be supported by independent corroborative evidence. Kerley misreads section 1390. Section 1390, subd. (b)(2) does not require that each statement admitted under that section be independently corroborated; it requires only that the elements of subdivision (a)—that is, that Kerley engaged in wrongdoing that was intended to, and did, procure Dever's unavailability as a witness—be supported by independent corroborative evidence.

[16] Kerley argues this court may consider only the evidence presented to the trial court when the motion was heard, citing *People v. Welch* (1999) 20 Cal.4th 701, 739; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425. Neither case is on point. (Cf. *People v. Smithey* (1999) 20 Cal.4th 936, 971–972 (*Smithey*) [on appeal, the court

45

Desirae testified that Kerley would not allow Dever to attend family functions. Officer Cross testified Dever told her that Kerley had stomped on her right hand and foot and kicked her in the eye. When she tried to call 911, Kerley said he would kill Dever if anyone from the police department came to the house. Finally, Deborah M. testified Dever told her shortly before she disappeared that Kerley was upset about his upcoming court date in the domestic violence prosecution and blamed Dever for the pending charges.

Kerley may have had additional motives for killing Dever. The question, however, is whether the evidence showed by a preponderance that preventing Dever from either reporting his assaults to the police or testifying against him in the pending domestic violence case was one of Kerley's motives for killing Dever; it need not have been his only reason. (*Banos, supra,* 178 Cal.App.4th 483, 502–504.)

When compared to the cases applying the doctrine of forfeiture by wrongdoing, the evidence in this case of Kerley's intent is quite compelling. In the Supreme Court's first application of the doctrine, *Reynolds v. United States* (1879) 98 U.S. 145 (*Reynolds*), the defendant was charged with bigamy. At his first trial, the defendant's second wife, Mary Jane Schofield, testified against him. In a second trial on the same indictment, the prosecutor issued a subpoena for Schofield, who lived with the defendant. When an officer went to the house to serve Schofield with the subpoena, the defendant told him she was not home and refused to disclose her whereabouts. The defendant said Schofield would not appear at his trial. When the officer made a second attempt to serve the subpoena on Schofield at the defendant's home, he was told by the defendant's first wife

---

considered evidence presented after the trial court's evidentiary ruling as a basis for affirming on a ground other than that relied upon by the trial court].) Moreover, section 1390 permits the trial court to consider evidence presented at trial if the foundational hearing is held after the trial has begun. (§ 1390, subd. (b)(3).) As noted, the trial court, near the end of the trial, overruled a hearsay objection to one of Dever's statements on the grounds that a reasonable jury could find that Kerley had caused Dever to be unavailable as a witness by killing her. Thus, the trial court ultimately concluded, after hearing the bulk of the trial evidence, that the doctrine of forfeiture applied to at least one hearsay statement.

that Schofield had not been at the house for three weeks. (*Id.* at pp. 159–160.)

On this showing, the Supreme Court held the defendant had forfeited his right to confront Schofield at trial and admitted her prior testimony into evidence. "The accused was himself personally present in court when the showing was made, and had full opportunity to account for the absence of the witness, if he would, or to deny under oath that he had kept her away. Clearly, enough had been proven to cast the burden upon him of showing that he had not been instrumental in concealing or keeping the witness away." (*Reynolds, supra,* 98 U.S. at p. 160.)

In *Jones, supra,* 207 Cal.App.4th 1392, the defendant was charged with making a criminal threat, grand theft, and simple assault of Bri-Ana Breland. The absent witness was a prior girlfriend, Dominique Durden, who had disclosed damaging information to the police. The evidence of the defendant's intent to dissuade Durden from testifying came from their recorded jail calls. In the calls, Durden expressed concern that the defendant thought she had talked to the police and assured the defendant that she had his back. The defendant implied that he had friends on the outside who could assist him in doing whatever was necessary. When Durden failed to appear in response to a subpoena, her testimonial statements to the police were read into the record. The court found the defendant's conduct constituted wrongdoing that dissuaded Durden from testifying and affirmed application of the doctrine of forfeiture by wrongdoing. (*Id.* at pp. 1398–1399.)

Kerley's long history of beating and threatening Dever, isolating her from family and friends, discouraging her from calling 911 or talking to the police, and anger over his pending domestic violence case provided far greater evidence of dissuasion than in *Reynolds* or *Jones*. Substantial evidence supports the trial court's implied finding that Kerley murdered Dever at least in part to keep her from reporting him to the police and testifying against him in his pending domestic violence case. (*Banos, supra*, 178 Cal.App.4th 483, 502–503.) Kerley therefore forfeited his right to object to Dever's unconfronted testimonial statements. (*Giles, supra*, 554 U.S. 353, 368, 377; *Banos*, *supra,* 178 Cal.App.4th at p. 503.)

47

### V. The Trial Court Did Not Err in Denying Motion for Mistrial Based on Alleged Crawford *Error*

Kerley argues the trial court erred in denying his motion for a mistrial after admitting evidence of Kerley's sexual relations with Dever and another woman. The trial court denied the mistrial motion on the grounds, as noted, that Kerley's trial counsel had opened the door on cross-examination and that Dever's description of the sexual history with Trudy was a spontaneous statement. The People respond that the trial court correctly ruled Kerley had opened the door and Dever's statements were spontaneous. In addition, the People argue Dever's statements were admissible to prove her state of mind under section 1250 and, in any event, the ruling did not deprive Kerley of a fair trial.

As discussed above, we have concluded that Dever's narration of the events leading up to Kerley kicking her in the head was testimonial, but that Kerley has forfeited his confrontation rights as to these statements by wrongdoing. The trial court, therefore, did not err in admitting Dever's statements into evidence or denying Kerley's mistrial motion on *Crawford* grounds. Kerley's contention that admission of this evidence was unduly prejudicial is addressed in Section XII below.

### VI. The Trial Court Did Not Err in Admitting Certain Hearsay Statements of the Deceased

Kerley argues many of Dever's statements to relatives, friends, and neighbors describing her fear of Kerley and the injuries she suffered at his hands were hearsay statements not subject to any exception and that their admission deprived him of a fair trial. The People argue most of the statements were admissible either as spontaneous statements under section 1240 or to prove Dever's state of mind under section 1250. In supplemental briefing, the People also argue Dever's statements were admissible pursuant to section 1390.

#### A. Additional Background

After lengthy pretrial motions, the trial court ruled that all but three of Dever's statements regarding prior domestic violence were spontaneous statements and were admissible under sections 1240 and 1250. The statements are these:

### 1. *Statements to Christy H.*

Christy H., who had known both Dever and Kerley since childhood, testified that Dever came over to her house one day, told her Kerley had beaten her up again, and asked her to close her blinds because Kerley was on his way over. Christy described Dever as "very upset," "very distraught," and anxious to have the blinds drawn, apparently so Kerley could not see her in the house. Kerley did arrive on his motorcycle and drove up and down the street in front of [Christy's] home. Dever told Christy she was afraid of Kerley.

### 2. *December 24, 1989 Statements to Kimberly R.*

Kimberly R. testified she received a call from Dever December 24, 1989. Dever spoke as if they had been at the bar together and had just separated. She asked, " 'Did you see that couple? . . . He must have kicked her in the face because she was bleeding. . . . [¶] They were fighting out front. . . . I can't wait until you get here. When are you coming over?' " Kimberly inquired, " 'Are you trying to tell me that [Kerley] has kicked you?' " Dever responded, " 'Yes, yes. When are you coming over?' " Kimberly told Dever she was going to call the police: " 'Do you really want me to call the police?' " Dever responded, " 'I can't wait.' " Kimberly hung up and called the police.

### 3. *December 24, 1989 Statements to Officer Harper*

As discussed above, when Officer Harper on December 24, 1989 pulled an injured Dever out of the front window of their house, Dever screamed, " 'Hurry, I know he's going to kill me.' " She was hysterical, frantic scared, panicked and crying. As Officer Harper drove Dever to the police station, Dever was no longer screaming, but had not calmed down. Dever continued to express concerns for her own safety and was very concerned for her daughter, even more than she was about her own injuries.

49

### 4. December 27, 1989 Statements to Emergency Room Doctor

On December 27, 1989, three days after Kerley kicked Dever in the eye, Dever went to the hospital because of her injuries. Emergency room physician, Dr. Dane, testified Dever's chief complaint was that she was suffering from blurred vision and dizziness because she was kicked in the eye by her ex-boyfriend. Dr. Dane diagnosed left-eye trauma, bruising around the eye, and multiple contusions.

### 5. 1993 Statements to Richard and Leeann H.

In spring 1993, Richard H. was working in his front yard across the street from Kerley's home when he heard hysterical screaming. Dever came running across the street from her house, hopped over the fence in their front yard, and ran into their house. She screamed, " 'He's got a gun. He's gonna kill me. He's gonna kill me. He's got a gun.' " Richard's wife, Leeann H., said she had never seen someone shake so much and be so petrified before in her life. When Richard and Leeann went to call 911, Dever begged them not to call because, she said, he (Kerley) would hurt her very badly if they called. Dever said he would kill her. After Dever begged them two or three times not to call, Richard and Leeann decided not to call 911.

In lieu of calling 911, Richard H. went to the home of a neighbor who was a police officer. The police officer went to talk to Kerley. When Richard returned home, Dever said Kerley was going to hurt her and that she was fed up and tired of it. She did not know how to escape it. Dever said she ran over to Richard and Leeann's house when Kerley threatened her.

### 6. Statements to Leeann H.

As noted, Leeann and Richard H. lived across the street from Kerley and Dever for years. Leeann was friendly with Dever. When she first moved in, Dever would wear shorts and tank tops in summer, but over time began wearing long-sleeved shirts and long pants, even on warm days. Dever would constantly rub her arms and legs. Leeann asked whether she was cold. Dever responded, "no, that [Kerley] had roughed her up the night before."

### 7. January 7, 1996 Statements to Officer Cross

50

As discussed above, on January 7, 1996, Officer Cross was dispatched to the Kerley residence on a call of domestic violence. She arrived approximately 14 minutes after the call went out and found that Dever had been placed in one patrol car and Kerley in another. Officer Cross interviewed both. When asked to describe Dever's demeanor, Officer Cross testified that Dever's makeup was smeared and it looked like she had been crying. Her eyes showed some blackening and her right wrist and ankle were turning red or beginning to swell. Dever told Officer Cross that Kerley had stomped on her right hand and foot and kicked her in the eye. When Dever tried to call 911, Kerley said he would kill Dever if anyone from the police department came to the house.

### 8. June 1996 Statements to Terry G.

Terry G. worked with Dever's sister Denae and supplied methamphetamine to Dever. One day, about a week before Dever disappeared, Dever called Terry approximately 30 times. She begged Terry for help. Terry met her at a market. Dever had a black eye and a cut lip and she looked scared. Dever told Terry she had woken up in her car with the car running despite the fact that she had gone to sleep in her bed the night before. Dever believed Kerley had drugged her. Dever asked Terry for methamphetamine because she "was afraid that if she fell asleep again or something, she was gonna—it was gonna end up looking like a suicide or something." As they parted, Dever said to Terry, " 'If anything happens to me, he did it.' "

### 9. May 1996 Statement to Marian A.

Marian A. was Deborah M.'s daughter and Dever's niece. Marian testified she last saw Dever in May or June 1996 in the living room of Dever's home. Kerley was home, but not in the living room. Dever was very scared and said to Marian's mother in a low voice, " 'if anything happens to me, dig up the backyard.' "

### 10. Statement to Deborah M.

Deborah M. was Dever's sister. When asked if she had seen Dever with any injuries, Deborah responded, "Just bruises on her back. I mean, she told me that he would—with a two by four, he would take two by fours to her and beat her on the back . . . is what she said how she got the bruises."

51

### B. Evidence Code Section 1390

We will affirm a trial court's decision if it is correct, even if it is based on erroneous reasoning. " ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety than, that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976 (*Zapien*), citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3rd 1, 19; *Smithey, supra,* 20 Cal.4th 936, 972.)[17]

As discussed above, we have concluded that Kerley by his wrongdoing forfeited his right to confront Dever on her testimonial statements. Having found that the evidence satisfies the elements of section 1390—that Kerley killed Dever at least in part to prevent her from reporting his abuse to the police or to keep her from testifying against him in his pending domestic violence prosecution—we conclude that all of Dever's hearsay statements were admissible under the hearsay exception carved out by section 1390.[18]

---

[17] Kerley argues the long-standing doctrine articulated in *Zapien* applies only to pure questions of law. *Zapien* contains no such limitation, and the doctrine is routinely applied in fact-dependent contexts. (E.g., *Zapien, supra,* 4 Cal.4th at pp. 975–976 [despite trial court's arguably flawed reasoning, court of appeal finds that a witness's prior preliminary hearing testimony was admissible under section 1291 because the defendant had the opportunity and a similar motive to cross-examine the witness at the preliminary hearing]; *Smithey, supra,* 20 Cal.4th at p. 972 [appellate court finds that testimony eliciting the murder victim's out-of-court statement was admissible to prove her state of mind, which was placed in issue by the defendant's subsequent testimony].)

[18] Kerley argues it is unfair to apply section 1390 on appeal because he had no opportunity to make a record regarding its applicability below. As noted, however, the parties fully argued forfeiture by wrongdoing in pretrial motions below (albeit without reference to section 1390), so Kerley had an adequate opportunity to develop his record on this issue. Both parties also have addressed this specific issue in supplemental briefing in this court. In his supplemental briefing, Kerley does not identify any additional evidence he would have presented in the trial court. We conclude the record is adequately developed for application of section 1390 to the present case. (See *Banos,*

52

Thus, it is unnecessary to reach the parties' arguments regarding section 1240, section 1250, and forfeiture.

### C. Evidence Code Section 352

As we have discussed at length above, evidence that Kerley consistently and repeatedly beat Dever throughout the course of their relationship was properly admitted to prove quite persuasively that Kerley had a propensity to do just that. Dever's stated fear of Kerley and her belief he would likely kill her provided compelling evidence that it was highly unlikely she would entrust her beloved daughter to such a man.

On the other hand, hearsay statements of a murder victim's fear of the defendant or her belief that the defendant will kill her carry a high risk of prejudice to the defendant. The jury may very well conclude that the victim's fear accurately reflected the defendant's intent and that the victim correctly predicted that the defendant would kill her. (*People v. Thompson* (1988) 45 Cal.3d 86, 102; *People v. Green* (1980) 27 Cal.3d 1, 26; *Ireland, supra,* 70 Cal.2d 522, 532.)

On balance, we conclude the trial court did not abuse its considerable discretion in concluding that the probative value of this evidence substantially outweighed any undue prejudice from its admission. The entire trial came down to whether the jury concluded Kerley had beaten Dever to death, consistent with his propensity to assault her, or whether Dever had simply left her daughter to be raised by a man she considered violent and dangerous. Dever's statements provided potent evidence of his propensity to beat her and convincing evidence that she would not likely leave her daughter to be raised by him alone. The probative value of this evidence outweighed the risk of undue prejudice. (*Fruits, supra*, 247 Cal.App.4th 188, 205–209; *Johnson, supra*, 185 Cal.App.4th 520, 533–534.)

### VII. Defense Counsel Was Not Ineffective in Failing to Request a Limiting Instruction

*supra,* 178 Cal.App.4th 483, 500–503 & fn. 12 [on remand from the United States Supreme Court, court of appeal determines application of forfeiture by wrongdoing doctrine to facts of that case without trial court findings on the issue].)

Kerley argues his trial attorney was ineffective because she failed—once the trial court admitted evidence that Kerley abused Dever under section 1250—to request an instruction limiting the jury's consideration of such evidence to Dever's state of mind. The People respond that very few of Dever's statements were admissible only to prove her state of mind; most were also admitted under section 1240, rendering them fully admissible without the need for a limiting instruction. They also argue trial counsel could have had valid strategic reasons for her decision not to request a limiting instruction. Finally, the People argue Kerley fails to show he was prejudiced by any failure to request a limiting instruction.

To prevail on an ineffective assistance of counsel claim, Kerley must show: (1) that his attorney's performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice; *i.e.*, that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 691–694.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

As detailed above, Dever's statements were fully admissible under section 1390. Therefore, counsel was not ineffective for failing to request a limiting instruction.

## VIII.  *The Trial Court Did Not Prejudicially Err in Instructing the Jury Regarding Suppression of Evidence*

Kerley argues that the trial court erred by instructing the jury pursuant to CALCRIM No. 371, which provides: "If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions.  It is up to you to decide the meaning and importance of this evidence.  However, evidence of such conduct cannot prove guilt by itself."

The prosecution sought this instruction on the theory that Kerley's mother had written the anonymous letter to the police suggesting that Dever's killer was a man

named "Danny" in an attempt to draw suspicion away from her son. Kerley argues that it was error to give the instruction because no evidence supports the inference that Kerley's mother wrote the letter or that she did so in Kerley's presence or with his authorization.

"Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. . . . [T]here must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference. Furthermore, the determination of whether there is such evidence in the record is a matter which must be resolved *by the trial court before* such an instruction can be given to a jury." (*People v. Hannon* (1977) 19 Cal.3d 588, 597–598 (*Hannon*), disapproved on other grounds in *People v. Martinez* (2000) 22 Cal.4th 750, 762–763.) As relevant here, the evidence need not conclusively establish fabrication by others or defense authorization of the fabrication before the instruction may be given; " 'there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 921.)

On appeal, the People argue that there was sufficient evidence to support the instruction. In support of the inference that Kerley's mother sent the letter, the People point to Kerley's mother's testimony that she never witnessed domestic violence or saw Dever with injuries as evidence that Kerley's parents were willing to lie to protect him. The People also suggest that because Kerley's parents were present at Kerley's house the morning Dever disappeared, they may have been involved with covering up the crime. According to the People, because the letter "was intended to deflect suspicion away from [Kerley] with false assertions," and because Kerley did not write the letter himself, the jury could reasonably conclude that Kerley authorized or was involved with the letter's creation.

We agree with Kerley that the evidence was insufficient to support an inference that he authorized or was present for the writing of the letter. However, we conclude that the error was rendered harmless by the balance of the instruction. The jury was instructed that an adverse inference of consciousness of guilt was permissible only if it

first found "someone other than [Kerley] tried to create false evidence [or] provide false testimony," and then "only if [Kerley] was present and knew about that conduct, or, if not present, authorized the other person's actions." The jury was further instructed to "decide the meaning and importance of this evidence" and cautioned that "evidence of such conduct cannot prove guilt by itself." Elsewhere, the jury was instructed that some instructions might not apply, depending upon its determination of the facts, and it should follow the instructions that applied to the facts as it found them. We presume the jury understood and followed these instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) At worst, there was no evidence to support the instruction and it was superfluous. (See *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 48–49 [if evidence did not support consciousness of guilt instruction, "we presume that the jury concluded that the instructions did not apply to him and it should not infer a consciousness of his guilt"]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1225 [any error in giving instruction on fabrication of evidence was harmless because " '[a]t worst, there was no evidence to support the instruction and . . . it was superfluous' " (quoting *People v. Pride* (1992) 3 Cal.4th 195, 249)]; *Crew, supra,* 31 Cal.4th 822, 849 [similar].) Given the voluminous evidence in this lengthy trial, and the limitations and cautions built into the instruction itself as discussed above, we conclude that " '[u]nder the circumstances, reversal on such a minor, tangential point is not warranted.' " [19] (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1225.)

---

[19] The tangential nature of the letter evidence here distinguishes this case from *Hannon*, *supra*, 19 Cal.3d 588, upon which Kerley relies. In *Hannon*, an investigator with the district attorney's office, Leach, testified that he asked the defense's key alibi witness, Brown, if he would answer several questions. (*Id*. at p. 596.) Brown refused, stating that " '[an] attorney' " or " 'his attorney' " had ordered him not to speak to representatives of the People. (*Ibid*.) The prosecution successfully sought a consciousness of guilt instruction on the theory that the defendant had suppressed evidence by forbidding Brown from speaking to the prosecution. (*Id*. at pp. 596–597.) The Supreme Court held that this was error, because the record failed to supply the necessary nexus between the defendant himself and the alleged suppression of evidence. (*Id*. at pp. 599–600.)

### IX. The Trial Court Did Not Err in Admitting Mandee Kerley's Diary Entries for Purposes of Impeachment

At trial, Kerley called his daughter, Mandee Kerley, as a defense witness. During direct examination, Mandee testified her parents had a good, non-violent relationship. On cross-examination, the People impeached this testimony by eliciting three entries from her diary, which Kerley asserts were admitted into evidence in error. In particular, the trial court admitted, over defense counsel's objection:

1.     A diary entry in which Mandee described going away for a weekend to her grandparents' house, and coming home to find a "hole in the door" and that her mother "seemed really high strung." Later that day, Dever told Mandee that Kerley had "taken a weight bar and that he tried to choke her with it," that she "gasped for air" and "thought she was going to die."

2.     An entry from 2003 in which Mandee (then age 16) described stepping on the ribs of her friend Shawn when she was five years old. Referring to her father, Mandee wrote: " 'Sure, at times I hated him. [¶] . . . [¶] In fact, for awhile when my mom left I blamed him for his psychotic behavior. [¶] . . . [¶] But, although at times he makes me want to either hit him or make me cry furiously, I still have some strange loyalty to him. [¶] . . . [¶] Like, although he was abusive to my mother, I think I understand it. [¶] . . . [¶] I'm not justifying it, but sometimes people can make me so furious that even if you love them you hurt them. [¶] . . . [¶] I did so once to my friend Shawn.' " Mandee then described stepping on Shawn's ribs while her friend Elizabeth screamed for her to stop. " 'I did but it took awhile. [¶] . . . [¶] It's like you want to hurt them but you aren't sure how to emotionally, so sometimes I resorted to physical

---

In concluding that the error was not harmless, the Supreme Court observed that the case was "close," and that "[d]efendant's hopes for acquittal rested on two grounds," one of which was the "strength of Brown's alibi testimony." (*Id*. at pp. 602–603.) Because the suppression of evidence allegations might "destroy the credibility" of Brown, a critical defense witness, the court found the error was not harmless beyond a reasonable doubt. (*Id*. at p. 603.) Here, by contrast, the testimony regarding the anonymous letter was a relatively minor point upon which the prosecution's case did not depend.

violence. [¶] . . . [¶] Do I blame this on what I saw from my parents? No, oddly enough, I don't.' "

3.  An entry dating from April 1998, when Mandee Kerley was 11 years old, in which she stated she was angry at her stepmother, Laura Kerley, and was " 'just waiting for the right time to shoot or stab her and she'll never expect it because I act so nice like a goodie two shoes.' " She also wrote, " 'Die, bitch, die.' "

The defense moved in limine to exclude the diary entries on the theory that they would be "irrelevant and prejudicial" and would "include[] character evidence" because Mandee had written about how her father was "controlling." The trial court denied the motion and ruled that the diary entries could be used to impeach Mandee if she testified inconsistently with what she had written in the diaries about her personal observations of Kerley's domestic violence.

During Mandee's cross-examination at trial, defense counsel again objected to the introduction of the first diary entry, this time on hearsay grounds. The prosecutor argued that she intended to use the diary entry for impeachment, and the trial court overruled the objection and admitted the entry for the limited purpose of impeachment of Mandee's testimony regarding her parents' relationship. After Mandee testified regarding the first diary entry, the trial court admonished the jury that the diary entry was "not being admitted into evidence for the truth of the matter stated, that, for instance, this bar incident with the bar may have happened or not, because this witness didn't see it. She may have been told that, but it's not being offered for the truth of the matter stated. What it's being offer [sic] for is to impeach this witness who has previously said that, in her opinion, the relationship was good, not violent." Mandee went on to testify about the second two diary entries, after the trial court overruled defense counsel's objections based on hearsay and relevance. At the end of the trial, the court instructed the jury that "[t]he diaries of Mandee Kerley should not be considered as evidence of the truth of the matters stated therein. They have only been received in evidence for the limited purpose of evaluating the testimony of the witness Mandee Kerley."

On appeal, Kerley argues that Dever's statement to Mandee regarding the weight bar incident was inadmissible because it was multiple hearsay and did not qualify for any hearsay exception. Kerley argues that the second and third diary entries were improperly admitted because they were irrelevant. Finally, Kerley argues that even, if the diary entries were admissible for impeachment purposes, they were nevertheless inadmissible under the balancing test set forth in section 352.

*1. Dever's Statement in the First Diary Entry*

Kerley's arguments fail with respect to Dever's statement in the first diary entry, because "out-of-court statements not offered to prove the truth of the matter stated are not regarded as hearsay. No special exception to the hearsay rule need be invoked for their admission; *they are not within the hearsay rule at all*." (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 5, pp. 788–789; see *Am-Cal Investment Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542 ["Extrajudicial statements offered for impeachment are not hearsay since they are not offered for the truth of the matter asserted"].) On reply, Kerley responds that the statement was offered for its truth because it was relevant only if it was true. We disagree.

Mandee testified that her mother and father had a "good relationship," and that she never saw any "physical fights" or "physical violence" between them. Mandee also testified that there was not "a lot of anger in [her] house." We think that the fact that Mandee had been told by Dever that Kerley choked her with a weight bar, even apart from its truth, had some "tendency in reason to . . . disprove the truthfulness of [her] testimony" that her parents had a good, non-violent relationship, such that the trial court did not abuse its broad discretion in finding the statement admissible for impeachment purposes. (§ 780; See *People v. Clark* (2011) 52 Cal.4th 856, 931–932.)

In any event, any error in admitting Dever's statement was harmless. As noted above, the jury was admonished during Mandee's testimony that the statement was not being admitted for its truth, and was instructed again at the close of trial that all the diary entries were admitted for the limited purpose of impeaching Mandee Kerley's testimony and not for their truth. Given the voluminous evidence of domestic violence in this case,

59

including Dever's numerous statements recounting beatings to friends, neighbors, and the police, we conclude that, had the trial court excluded the fact that Mandee recorded Dever's statement, apart from its truth, it is not reasonably probable that a result more favorable to Kerley would have been reached.

### 2. *Mandee Kerley's Second and Third Diary Entries*

We agree with the People that the second and third diary entries were relevant as impeachment evidence. Mandee Kerley's statement that Kerley " 'was abusive to [her] mother,' " her description of an incident in which she herself " 'resorted to physical violence,' " and her statement that she did not " 'blame this on what [she] saw from [her] parents' " tended to discredit her testimony at trial that her parents had a "good relationship," and that she never saw any "physical fights" or "physical violence" between them. The trial court did not abuse its broad discretion in admitting this evidence for impeachment purposes.

### 3. *Undue Prejudice*

Finally, Kerley argues that, even if the diary entries were admissible for impeachment purposes, they were unduly prejudicial because of the danger that the jury would use the diary entries to conclude that Dever's death resulted from the type of acts that Mandee wrote about, and that the jury would use the entries to corroborate the uncharged acts of domestic violence. We disagree. As discussed above, the jury was twice instructed not to consider the diary entries for the truth of the matters stated therein and to use them only for the purpose of evaluating Mandee's testimony. We presume that the jury followed these instructions and did not consider the diary entries for any impermissible purpose. (See *People v. Wilson* (2008) 44 Cal.4th 758, 803 ["We of course presume 'that jurors understand and follow the court's instructions' "].)

### X. *The Trial Court Did Not Err in Admitting Evidence That Kerley Buried a Suitcase and Disposed of His Tanning Bed*

Kerley argues that the trial court violated his due process rights by admitting evidence that he: (1) dismantled and disposed of a tanning bed in early 2007; and (2) buried the remains of his dog in a suitcase with a necklace and certain articles of

women's clothing in 1998.  Kerley argues that the evidence was irrelevant, and any probative value was outweighed by the substantial danger of undue prejudice.

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)  "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection. [Citations.]"  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.)

Trial courts enjoy " 'broad discretion' " in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  (*People v. Michaels* (2002) 28 Cal.4th 486, 532; see *People v. Memro* (1995) 11 Cal.4th 786, 866; *People v. Perry* (2006) 38 Cal.4th 302, 318.)  A trial court's exercise of discretion "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*Rodriguez, supra,* 20 Cal.4th 1, 9–10.)

*1. Evidence Regarding Suitcase Burial*

At trial, over defense objection, the prosecution introduced evidence that in 1998 Kerley buried in the backyard of the Oakbrook residence a nylon suitcase that contained the remains of his dog, as well as "a necklace with a cross on it," "a small ball, some pieces of clothes, dark or grey . . . like lady's nylon sweatpants, a collar, [and] a hair brush."[20] Laura K. also testified that Kerley buried his dog in the backyard in 1998 and that, when she went outside to see what Kerley was doing, he "yelled at [her] to go back inside."

We do not agree that the trial court abused its discretion in admitting this evidence under section 352. The evidence, although circumstantial and weak, had some "tendency in reason" to support an inference that Kerley used the opportunity of his dog's death to bury clothing of Dever's that would otherwise associate him with the crime—an inference further supported by the fact that Dever's body was discovered without clothing—and that he did not want Laura to discover what he was doing. (See § 210.) We also do not agree with Kerley that this probative value was substantially outweighed by the danger of undue prejudice. Far from "bizarre and macabre," the evidence that Kerley buried his dog actually provided an explanation for Kerley's digging in the backyard. Evidence that Kerley buried the remains of his deceased pet was hardly likely to inflame the jury's passions against him. There was no abuse of discretion.

*2. Evidence Regarding Tanning Bed*

At trial, over defense objection, the prosecution introduced evidence that in early 2007, shortly after receiving phone calls from the police regarding Dever's disappearance, Kerley took his tanning bed into the backyard and "chopped it up," placed

---

[20] The People argue that Kerley's claim regarding the dog burial evidence is forfeited because it was defense counsel who elicited this evidence, and because defense counsel did not object when Laura K. testified on that subject. Kerley responds that the prosecution first elicited evidence on the suitcase burial in general, so he had to elicit the death and burial of the dog to explain why the suitcase was buried in the backyard. We need not decide whether this claim is forfeited, because as discussed above, we find no error in admitting this evidence.

it into Laura's car, and took it away. Laura also testified that the tanning bed had been broken for about a year before Kerley disposed of it, that he had made some calls about repairing it, and that he had investigated purchasing a new tanning bed to replace it.

Kerley argues that this evidence was improperly admitted because it was irrelevant, asserting that destruction of the tanning bed did not show consciousness of guilt. We find no abuse of discretion. Although circumstantial and not particularly convincing, the timing of Kerley's destruction of the tanning bed had some tendency to support the inference that it had something to do with Dever's disappearance. (See § 210.)

In any event, the admission of this evidence did not create any danger of undue prejudice. Kerley introduced evidence that the tanning bed was not working, and Laura Kerley testified that her car was a hatchback, which may have explained the need to dismantle the tanning bed. In closing, the prosecutor disclaimed any reliance on the evidence regarding the tanning bed, telling the jury that "whether [Dever] was crushed in [the tanning bed], whether she was stomped, whether she was beat [sic], whether she was kicked, whether she was punched, whether she was strangled, whether she was shot, stabbed, what we know is that somebody murdered her." The evidence regarding the tanning bed was a fairly minor and collateral point in a weeks-long trial, and we find no abuse of discretion in its admission.

### XI. *The Trial Court Did Not Err in Excluding Evidence of Third Party Culpability*

Kerley argues that the trial court erred in excluding evidence regarding the culpability of two third parties: Danny Lewis and Joe Naso.

Third party culpability evidence is to be treated like any other evidence, i.e., "if relevant it is admissible . . . unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) However, California courts "do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or

63

circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall*, *supra*, 41 Cal.3d at p. 833; see *People v. Elliott* (2012) 53 Cal.4th 535, 580 [same].)  We review a trial court's ruling on the admissibility of third party culpability evidence for abuse of discretion.  (*People v. Elliott, supra,* 53 Cal.4th 535, 581.)

      *1.  Evidence Regarding Danny Lewis*

As discussed in connection with the instructions regarding suppression of evidence, the prosecution introduced into evidence a July 16, 1996 anonymous letter to the Solano County District Attorney's Office on the theory that it had been written by Kerley's mother.  The letter stated that someone named "Danny," who frequented a Buckhorn Bar and Carolyn's Bar in Dixon, was bragging about killing a woman over a drug deal gone bad, and " 'said that he killed a woman and threw her body in some bushes off Highway 13 near Rio Vista.' "  Defense counsel sought to introduce evidence that one Danny Lewis was the "Danny" referenced in the letter and that Dever was the woman killed.  In particular, defense counsel said she would call Danny Lewis, who would testify that he matched the description of "Danny" in the letter, although he would deny that he wrote the letter or killed Dever.  Defense counsel also proffered defense and prosecution investigators who would testify as to their respective interviews with Lewis, and who would confirm that Lewis matched the description in the letter.  The trial court ruled that defense counsel could argue to the jury that someone named "Danny" was the actual perpetrator based on the letter, but excluded the other witnesses proffered by defense counsel because there was no evidence linking Danny Lewis to the actual perpetration of the crime.

On appeal, Kerley asserts that the evidence regarding Lewis was "capable of raising a reasonable doubt," and that it was unfair to allow the prosecution to argue that Kerley's mother wrote the anonymous letter without also permitting Kerley to argue that Lewis was responsible for Dever's death.  We disagree.  In order to connect Lewis to the crime, the evidence had to establish that Lewis was the "Danny" referenced in the anonymous letter, and that the "body in some bushes off Highway 13 near Rio Vista" was

Dever. While Lewis's proffered testimony may have tended to establish the first connection, there was no evidence in support of the second. Lewis would have denied killing Dever, and there was no evidence that he ever met Dever or participated in any "drug deal gone bad" with her. The letter asserted that "Danny" claimed in May 1996 that he had killed the woman, but Dever was not killed until June 1996. In addition, the letter was anonymous, and Kerley proffered no evidence to corroborate the hearsay statements contained therein. Under these circumstances, the trial court did not abuse its discretion in concluding that Kerley had failed to offer sufficient "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall*, *supra*, 41 Cal.3d at p. 833.)

2. *Evidence Regarding Joe Naso*

Kerley also proffered evidence suggesting that Joe Naso killed Dever. At the time of Kerley's trial, Joe Naso was on trial in Marin County for murdering four women, each with an alliterative name (Roxene Roggasch, Carmen Colon, Pamela Parsons, and Tracy Tafoya) in 1977, 1978, 1993, and 1994, respectively. The women were dumped in rural areas or on the side of the road. Kerley also suggested that Naso was responsible for the unsolved murder of Heather Hibbs, who was found in 2002 in an irrigation canal in Solano County approximately eight miles from where Dever's body was found in 1996. Naso told a defense investigator that he had "passed through Solano County many times" and would go to public parks in the nearby town of Dixon in order to " 'people watch.' " Naso also took photographs of his victims and other women naked from the waist down. The trial court excluded this evidence, finding that it was insufficient to link Joe Naso to the actual perpetration of the crime.

We conclude that the trial court did not abuse its discretion. There was no direct evidence linking Naso to the crime or to Dever. Sergeant Dora Shelton with the Solano County Sheriff's Office testified that "quite a few" body dumps occur in the county, and responding to such scenes is "not unusual." Given this testimony, the trial court did not abuse its discretion in finding that Naso's alleged pattern of murdering women with alliterative names and dumping their bodies in rural locations in neighboring counties

65

was not "so unusual and distinctive as to be like a signature," as required. (*People v. Suff* (2014) 58 Cal.4th 1013, 1063.) Nor did the trial court abuse its discretion in rejecting Kerley's argument that Naso could have murdered Dever because she was found covered in a blanket from the waist up, and Naso often took photographs of his victims and other women naked from the waist down. Finally, the proffered testimony that Naso admitted to "passing through Solano on many occasions" and to "people watching" in the town of Dixon amount, at best, to evidence of "opportunity to commit the crime," which is insufficient to establish admissibility. (*People v. Hall*, *supra*, 41 Cal.3d at p. 833.) We find no abuse of discretion in the exclusion of Kerley's third party culpability evidence.

### XII. There Was No Cumulative Error

We have concluded that the trial court erred in admitting Dever's statement that the reason Kerley kicked her in the head in 1989 was because she failed to procure a woman for three-way sex after Trudy declined to participate due to Kerley's violent tendencies. Although this evidence was prejudicial, its admission—in light of the extensive evidence of Kerley's violent treatment of Dever—was not likely to have had a significant impact on the jury. We have also found the evidence did not support the consciousness of guilt instruction as it related to the "Danny" letter. This error, however, was harmless in light of the instruction as a whole. On balance, it is not reasonably probable that Kerley would have received a more favorable result had these errors not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Any arguable constitutional error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 26.)

### DISPOSITION

The judgment is affirmed.

66

_____

REARDON, J.

We concur:


_____

STREETER, ACTING P. J.


_____

SMITH, J.*


*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Kerley*
(A138219)


Trial Court:        Superior Court of Solano County, No. FCR286584


Trial Judge:        Hon. Allan P. Carter


Attorneys:        Jonathan Soglin and L. Richard Braucher, by appointments of the Court of Appeal under the First District Appellate Project's independent case system, for Defendant and Appellant.

                    Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffery M. Laurence, Assistant Attorney General, Catherine A. Rivlin and Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.