Filed 3/2/21  P. v. Johnson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM PAUL JOHNSON,<br><br>    Defendant and Appellant. | A159478<br><br>(Contra Costa County<br>Super. Ct. No. 51900711) |

A jury convicted defendant William Paul Johnson of spousal battery causing injury with a prior conviction for spousal battery causing injury (Pen. Code, § 273.5, subd. (f)(1)) and found true the allegation that he had inflicted great bodily injury on the victim under circumstances involving domestic violence (Pen. Code, § 12022.7, subd. (e)).[1]  We conclude defendant's appeal is lacking in merit and affirm the judgment.

---

[1]    Defendant was also convicted of the misdemeanor offense of contempt of court for violating a protective order in favor of the victim. (Pen. Code, § 166, subd. (c)(1).)  He raises no challenge to this conviction.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant appeals on the sole ground that the trial court should have excluded evidence of eight prior acts of domestic violence against the victim under Evidence Code section 352.

### A. The October 2, 2018 Spousal Battery

The case against defendant on the spousal battery charge included the following evidence.

The victim[2] testified she and defendant were at home during the day on October 2, 2018. Defendant had been drinking during the previous few days, and the victim started drinking in the late afternoon into the evening. Sometime during the evening, defendant suddenly and without provocation began punching the victim in the face, head, and torso. He punched her "over and over again, just continuously." The victim unsuccessfully attempted to stop him by kicking at him but she did not make contact. When she ran into the bedroom, she tripped over a dog gate, fell, and lost consciousness. After regaining consciousness, the victim washed blood off her face, got dressed, grabbed her purse, and, as she left the house defendant said "Sorry."

The victim then drove to the home of her mother D.S. who "gasped" on seeing the victim's face and asked what happened. The victim said, "He really beat me up this time, Mom." D.S. had previously seen similar severe injuries sustained by the victim. D.S. could tell the victim had been drinking (but not that much). Although the victim begged her mother not to call the police for fear of retaliation from defendant, D.S. called the police over her objections. Also, the

---

[2] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we do not use the victim's name and shall refer to certain witnesses by their initials.

victim initially refused to go to hospital because she "knew that they were mandated reporters, and if [she] went there with injuries that they would file a report." The victim's friend L.L. ultimately convinced her to go the hospital and drove her there.

Police Officer Arturo Becerra testified he spoke with the victim at the hospital and documented her injuries—she had bruises on her arms and torso, severe swelling to the left side of her face, dried blood around her nose, and her left eye was swollen shut. The victim also complained of intense pain in her lower back. Becerra did not notice any signs that the victim was intoxicated, and he did not smell any alcohol on the victim. The officer then went to the victim's home and spoke with defendant between 11:30 to 11:45 p.m. on October 2. Becerra saw no injuries on defendant, though he appeared disoriented as if he had just been asleep. Defendant had a slight slur when speaking to the officer and admitted he had been drinking throughout the day. After being transported to the county jail and informed of the victim's hospitalization, defendant did not inquire as to the hospital where she had been taken. Defendant did not mention any worry that the victim had been binge drinking that day. Defendant asked why the victim was at the hospital, but did not ask about her injuries.

The victim continued to suffer the physical effects from her injuries, including severe pain in her face, chest and stomach area for weeks, a swollen eye for months, and the removal of her gall bladder after experiencing pain on the right side of her abdomen where defendant had punched her. The jury was shown photographs of the victim's injuries that were taken shortly after the incident and over time.

3

Defendant testified both he and the victim drank regularly, and while defendant drank openly, the victim would hide and deny her drinking when questioned. Defendant admitted he would sometimes suffer blackouts and memory loss when he drank in excess. He and the victim argued constantly, with their drinking intensifying the arguments, but the arguments never escalated to physical altercations.

Defendant explained that on October 2, the victim was very intoxicated, and he was concerned she would fall and injure herself as she had done in the past. Defendant decided to take the day off from work to take care of the victim. The victim continued to drink, and defendant also had some drinks. During the day they had some discussions but no arguments. That evening, defendant and the victim drank together and watched television. The victim went to sleep on the living room couch, and defendant went to sleep in their bedroom. According to defendant the victim had no injuries at that time. Defendant was later awakened by the police knocking on the front door. He did not know why the police were there, and he thought it odd that the victim was not in the house. He told the police that the victim had probably gone to her mother's house. When the police told defendant that the victim was at the hospital, defendant was concerned and shocked and did not recall exactly what he had said to the police. He admitted that when he spoke to the police he was so intoxicated he could not recall what happened that day. He did not later remember anything about the evening and claimed the incident did not occur as described by the victim because the day was uneventful until the police came to the house. He denied striking the victim or doing anything to cause her injuries that evening. After seeing the photographs of the

4

victim's injuries, defendant testified "it didn't happen," and he did not know where or how the victim got the injuries documented in the photographs.

## B.  Evidence of Prior Domestic Violence Acts

The jury heard evidence concerning eight prior domestic violence incidents between the victim and defendant:

*(1)  Defendant tried to suffocate the victim by placing a pillow over her face while she was sleeping.*

The victim testified that while she was sleeping in bed defendant tried to suffocate her by putting a pillow over her face and holding it down firmly.  Defendant told the victim he wanted her to know what it felt like to have an asthma attack similar to his own experience earlier that evening.

On the stand, defendant denied that the incident ever happened.

*(2)  Defendant attempted to strangle the victim after she laughed while watching a movie.*

The victim testified that prior to this incident, she and defendant had been drinking.  The victim and defendant's daughter began watching a movie in the living room while defendant slept or was passed out on the floor.  When the victim and the daughter laughed at the movie, defendant woke up and attempted to strangle the victim in front of his daughter.

Defendant testified the incident never happened, and he never attempted to strangle the victim in front of his daughter.  S.J., defendant's adult daughter and the victim's stepdaughter, testified she never saw any physical violence between defendant and the victim, and

5

specifically she never saw defendant attempt to strangle the victim while S.J. watched a television movie with the victim.

*(3) Defendant pushed the victim after he found her sleeping in a closet.*

The victim testified that on one occasion, while defendant had a friend in the house, she decided to sleep in a closet. The victim went into the closet because she was afraid of defendant, who had been drinking all day. Defendant later opened the closet door, and they began to argue and push and shove each other. Defendant pushed the victim causing her to fall to the floor. The victim called the police, and defendant was arrested and released the next day on bail.

Defendant testified that before he went to work that evening, he was surprised to find the victim in the closet. He woke her up and told her to go to bed. Thereafter they wrestled over his car keys, and he pulled away. The victim followed him to his truck, and he then left for work. Later the police contacted defendant at work, and defendant spoke with the police for a few minutes.

*(4) Defendant punched the victim during a drive home after an anniversary dinner.*

The victim testified that while driving home from celebrating their wedding anniversary, she and defendant took turns driving the car. At one point when the victim was driving, defendant, without comment, punched her in the face approximately seven or eight times, causing her to sustain a black eye. The victim pulled over and jumped out of the car, but later returned to the car and they drove home. The victim did not report the incident to the police because she did not want

6

to get defendant in trouble. However, she was later told that a family member had reported the incident to the police.

On the stand, defendant denied the incident ever happened. He neither recalled nor saw the victim with a black eye. A.J., defendant's adult son and the victim's stepson, testified he never saw any physical violence between defendant and the victim and specifically he never saw any evidence of an injury to the victim's face when she and defendant returned from the anniversary dinner. When the victim entered the house, she was holding her cheek so A.J. could not see her eye. A.J. saw defendant passed out in the car, and defendant did not wake up for five hours.

(5) *Defendant pointed a loaded gun at the victim on June 12, 2013.*

The victim testified that on this occasion she argued with defendant before she left for work. Defendant had been drinking and was very intoxicated, and he was holding a loaded gun as she left the house. After leaving the house, the victim realized she had forgotten her cell phone and she returned home. The victim, using her key, had no trouble opening the door; but when she entered the house defendant was directly in her face. He pointed a gun at her head and said he could have shot her. Defendant did not say he thought she was an intruder. After retrieving her cell phone, the victim left for work because she was worried she would lose her job if she did not report to work. However, the victim called the police and requested a wellness check because she was concerned for the safety of her stepdaughter and the dog in the house. The police made the check and confiscated defendant's firearm.

7

Defendant testified he was not intoxicated before the victim left for work that day. He had armed himself with a loaded firearm because his neighbor had recently experienced a home invasion robbery. When the victim returned to the house she had trouble opening the front door, leading defendant to believe an intruder might be trying to enter the house. When he saw the victim, defendant said he was not expecting her and he could have shot her. He denied pointing his loaded gun at the victim's head. When the police came to the house they confiscated his gun because he admitted he had been drinking.

*(6) Defendant punched the victim after an argument on March 17, 2015.*

The victim testified that on March 16, she and defendant had been drinking all day and that evening they argued while sitting on the porch. The argument escalated, and the victim went to their bedroom to lie down. Just after midnight on March 17, while the victim was lying on her side of the bed watching television, defendant walked to his side of bed, leaned over, and punched her in the face, causing her to sustain a black eye. Defendant then got into bed and went to sleep. Before hitting her, defendant had not tried to hug her or apologize for the earlier argument, and the victim had not punched or kicked defendant. After defendant punched her, the victim got out of bed and called the police, who later arrested him.

Defendant testified the victim had accurately described the incident, confirming the parties had a heated discussion on the porch and the victim had then gone to bed. He explained however, that as he went to hug the sleeping victim to apologize for their earlier argument

8

she woke up and struck him with her knee. Defendant was startled, and he reflexively "swung back" and punched the victim in the face with a closed fist. He then got into bed and went to sleep. Defendant did not realize he had hit the victim in the face at the time; he was highly intoxicated and his consumption of alcohol affected his memory. The police later awakened defendant and told him he was under arrest for domestic violence. After speaking with the police, defendant was able to recall the evening and admitted he hit the victim in the face with a closed fist. Defendant admitted he pleaded guilty to spousal battery with an injury and was subject to a protective order prohibiting him from assaulting the victim but allowing him to have peaceful contact with her.

(7) *Defendant attempted to strangle the victim in July 2017.*

The victim testified that on this occasion, she and defendant, who had been drinking all day, had plans to meet a friend at a restaurant. Defendant met the friend, but the victim decided to stay home and was asleep in their bedroom when defendant returned home. Defendant—angry that he had forgotten his wallet and did not have money at the restaurant—"busted down" the bedroom door and "shattered" the door frame, awakening the victim. Defendant screamed at the victim, got on top of her, and—with both hands around her neck—started to strangle her. After he stopped his physical assault, they had a verbal argument after which the victim left the house. The victim did not call the police because defendant was on probation, and she did not want him to get in trouble.

Defendant testified that when he returned home from the restaurant, he had tried to open the bedroom door, which was stuck.

9

When he leaned on the door, he broke it. He and the victim bickered about the door, but the argument did not escalate into a physical altercation. Defendant denied he tried to strangle the victim.

(8) *Defendant physically assaulted the victim in July 2018.*

The victim testified that on this occasion, she and defendant had been drinking and were watching television when defendant got angry about something he saw on the television. He pushed his fist into the victim's leg and arm, leaving bruises. The victim asked him to stop because he was hurting her. The victim did not call the police because defendant was on probation.

Defendant did not recall any incident where he and the victim had bickered and then the incident turned physical. He denied pushing his fist into the victim's leg and arm.

## DISCUSSION

Before trial, the prosecution filed a motion in limine seeking to admit evidence of the eight prior acts of domestic violence under Evidence Code sections 1109 and 352.[3] Defendant filed an opposition, seeking exclusion on the basis that the prior acts were improper propensity evidence and more prejudicial than probative under section 352.

At the in limine hearing, the court heard defense counsel's specific objections to specific incidents and the prosecution's arguments for admission. The court then explained its reasons for allowing admission of the evidence as follows: "[L]et me talk about remoteness. It looks as though there is a continuous series of alleged incidents . . . almost every year through 2018. And I think that's significant. Again,

---

[3]     All unlabeled statutory references are to the Evidence Code.

10

I believe that the nature of the relationship and dynamic between the two parties over time is . . . particularly probative. And I think the jury needs some context to evaluate the current charges, in light of the relationship and the nature of the relationship." After reciting the eight incidents, the court found "all of those are particularly probative of the nature of the relationship." While commenting the incidents "are prejudicial," the court ultimately determined that "the probative value far outweighs the prejudicial value" and ruled the incidents admissible.

Defendant's only contention on appeal is that the trial court abused its discretion in finding the evidence of the eight prior domestic violence acts was more probative than prejudicial under section 352. Applying the abuse of discretion standard of review, we may not overturn the trial court's decision in the absence of a finding that the decision "was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1304.) We see no abuse of discretion here.

"Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offence—is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).)" (*People v. Kerl*ey (2018) 23 Cal.App.5th 513, 531 (*Kerley*).) Section 1109, however, "carve[s] out" a specific exception to this general rule in cases involving domestic violence. (*Kerley*, at p. 531.) "Section 1109 provides, in relevant part, ' "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to section 352." ' (§ 1109, subd. (a).)" (*Kerley*, at p. 531.) "As

11

noted, section 1109 expressly incorporates the limitations of section 352. Therefore, before admitting evidence under section 1109, the trial court must exercise its discretion to determine whether the probative value of the evidence is 'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (§ 352.)" (*Kerley*, at p. 532.)

As a preliminary matter, we find it helpful to clarify what is not at issue in this appeal. Defendant does not dispute the admitted incidents qualified as acts of domestic violence under section 1109 and presents no argument or authority establishing that any prior incident was, on its own, inadmissible under section 352. He acknowledges that the trial court conducted the section 352 weighing process (see *People v. Branch* (2001) 91 Cal.App.4th 274, 281) and that the court informed the jurors of the limited use to which they could consider the prior acts using the language in CALCRIM No. 852.[4]

---

[4] Consistent with the language in CALCRIM No. 852, the jury was specifically instructed: "The People presented evidence that the defendant committed domestic violence that was not charged in this case [specifically, using one sentence to describe each of eight prior incidents]. [¶] . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. . . . [¶] If the People have not met this burden of proof, you must disregard the evidence entirely. If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit [the charged offense]. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that defendant is

12

Defendant, however, contends we should reject the trial court's rationale for admitting the evidence as more probative than prejudicial, because the sheer number of admitted prior acts "posed an intolerable risk to the fairness of the proceedings or the reliability of the outcome." According to defendant, the admission of the evidence resulted in mini-trials for each act for which there had been no conviction and therefore he was "burdened unduly by having to 'defend' " against those acts. (*People v. Falsetta* (1999) 21 Cal.4th 903, 916.)  In his reply brief, defendant expands on his argument, asserting the jury was presented with "a waterfall of past, contested behaviors," each of which "relied principally on the conflicting veracity" of either the victim or defendant, and in essence, the victim "was given the aura of veracity by being permitted to testify to each of these acts while defendant was pummeled by accusations of past domestic violence."  In defendant's view, it is "difficult to imagine that jurors would not be prejudicially impacted just in counting the number of alleged" prior acts in determining his guilt or innocence.  We see no merit to the claimed error.

It is well settled that the prejudice contemplated by section 352 " ' is not so sweeping as to include any evidence the opponent finds inconvenient.  Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes the evidence relevant. . . .  " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to

---

guilty of [the charged offense].  The People must still prove each charge and allegation beyond a reasonable doubt."

13

evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . . ' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439; italics omitted.) Thus, " 'evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*Id.* at p. 439.)

Despite defendant's arguments to the contrary, we see nothing in either the mere number or the nature of the prior acts that would inflame the emotions of the jurors and invite them to "prejudge [defendant] or consider extraneous factors." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1190, 1194 [upholding admission of eight prior domestic violence acts (two prior incidents against current victim and six prior incidents against former girlfriend) and rejecting defendant's complaint based on the "sheer volume of incidents" heard by the jury]; see *Kerley*, *supra*, 23 Cal.App.5th at pp. 534–535, 537–539 [upholding admission of 10 prior domestic violence acts against the victim of the charged offense].) As the court in *Kerley* explained, "evidence that [the defendant] abused [the victim] multiple times is more probative than evidence that he did so once or twice; it is the frequency, regularity, and severity with which [the defendant] beat [the victim] that infuses this propensity evidence with probative strength." (*Id.* at p. 536.)

The trial court here appropriately found the evidence of the eight prior domestic violence acts was highly probative. Similar to the

charged spousal battery offense, all of the prior acts concerned defendant's physical abuse of the victim, sometimes in connection with arguments and fueled by the parties' consumption of alcohol, where the violence included attempted suffocating and strangling, or punching or hitting the victim. While defendant had to defend against the prior acts as well as the charged offense, such circumstance is often present in a domestic violence case. Defendant had ample opportunity to challenge the victim's version of their relationship, the alleged prior acts, and the charged spousal battery offense. We find it highly unlikely that the jury may have disbelieved the evidence regarding the charged spousal battery offense, while nevertheless convicting defendant based on the evidence of the prior acts. Indeed, any potential for confusion and improper use of the prior acts evidence was minimized by the trial court's instruction with CALCRIM No. 852.

In sum, the trial court acted within its discretion in ruling that evidence of the eight prior domestic violence acts had significant probative value that was not "substantially outweighed by the probability that its admission would create a "substantial danger of undue prejudice." (§ 352.) Having so concluded, we do not address defendant's argument that he was prejudiced by the court's ruling.

**DISPOSITION**

The judgment is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Jackson, J.

A159478